**In re UNION MEETING PARTNERS, a Pennsylvania general partnership, Debtor.**

**Bankruptcy No. 92–17118DAS.**

United States Bankruptcy Court, E.D. Pennsylvania.

Feb. 14, 1995.

Aris J. Karalis, Ciardi, Maschmeyer & Karalis, P.C., Philadelphia, PA, for debtor.

J. Scott Victor, Saul, Ewing, Remick & Saul, Philadelphia, PA, for Lincoln Nat. Life Ins. Company.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

Presently before this court in the voluntary Chapter 11 bankruptcy case of UNION MEETING PARTNERS ("the Debtor"), a partnership which owns certain realty, is the Debtor's request that we confirm its Fourth Amended Plan of Reorganization ("the Plan") over the objection of the Debtor's first mortgagee, Lincoln National Life Insurance Company ("Lincoln"). In conjunction therewith, we are asked to decide a volley of motions filed in anticipation of and response to either the Plan itself, plan voting, or plan confirmation, including: (1) Lincoln's Motion for Valuation of Secured Claim ("the Valuation Motion"); (2) the Debtor's Motion Pursuant to 11 U.S.C. § 1126(e) to Designate Ballot Submitted by Lincoln in Class 3 and to Fix the Amount of Lincoln's Claim for Voting Purposes Under Class 1 and Class 6, Pursuant to Bankruptcy Rule 3018 ("the Debtor's Ballot Motion"); and (3) Lincoln's Expedited Motion to Strike Ballots of the Montgomery County Tax Claim Bureau and the Debtor's General Partners ("Lincoln's Ballot Motion").

When we retracted an earlier prohibition against further plan attempts by the Debtor, and permitted the filing of the Plan now before us, it was in recognition of the Debtor's recently secured post-petition financing commitment, and in the hope that, with a substantial cash-out as a real possibility, the parties would negotiate a consensual plan. Unfortunately, we were overly optimistic. It is clear to us now that both the Debtor and Lincoln perceive substantial, unrealized value in the Debtor's only asset, two adjoining office buildings in the Philadelphia suburb of Blue Bell, Pennsylvania ("the Property"), and neither will willingly give up its claim to the Property on its own terms without a fight to

the death. Thus, the Plan, which appeared to be the groundwork of a consensual reorganization, cannot be confirmed without Lincoln's consent for many of the same technical reasons that prevented confirmation of its predecessors. *See In re Union Meeting Partners,* 160 B.R. 757 (Bankr.E.D.Pa.1993) (*"Union Meeting I "*); *In re Union Meeting Partners,* 165 B.R. 553 (Bankr.E.D.Pa.) (*"Union Meeting III "*), *aff'd,* C.A. No. 94–2419 (E.D.Pa. July 29, 1994) (*"Union Meeting IV "*).

We have given the parties every possible opportunity to work out their differences and propose a consensual plan. We are not inclined to give them any more. Lincoln has already been granted relief from the automatic stay to attempt to foreclose its mortgage on the Property, and we have threatened to convert this reorganization case to a Chapter 7 case. Relief from the automatic stay and conversion of this case have been stayed by the District Court pending a determination of the Debtor's appeals of *Union Meeting IV* to the Third Circuit Court of Appeals. Those appeals (Nos. 94–1790 and 94–1791) were originally scheduled to be argued on the date of the filing of this Opinion, February 14, 1995. The argument has been continued, possibly in anticipation of this Opinion. Assuming that our prior decisions are not disturbed on appeal, we see no alternative but to convert this bankruptcy case to a Chapter 7 case to allow the trustee, the state courts, or Lincoln's eventual foreclosure to determine the future of the Property. In the meanwhile, we will not entertain any further requests of any party to file any further plan of reorganization unless such a plan is consensual.

### B. *FACTUAL AND PROCEDURAL HISTORY*

The tortuous history of this case, which documents the ongoing struggle between the Debtor and Lincoln to gain control of the Property, is set forth in great detail in the four opinions already spawned by this case. In addition to *Union Meeting I, III,* and *IV* already referenced, we complete the picture by noting the presence of *In re Union Meeting Partners,* 163 B.R. 229 (Bankr.E.D.Pa.), *aff'd,* C.A. No. 94–1074 (E.D.Pa. April 2, 1994) (*"Union Meeting II "*). After four prior presentations of its plan of reorganization, all of which relied on an impermissible use of the rents generated by the Property ("the Rents") belonging to Lincoln, and an unsuccessful challenge, in *Union Meeting II,* to Lincoln's security interest in the Rents as a preference, the Debtor now seeks confirmation of the instant Plan. As indicated above, we lifted a ban against any further plan filings and when the Debtor informed us that it had secured a $6.75 million post-petition financing commitment from Firstrust Bank ("1st Trust"). With a source of cash other than Lincoln's Rents, we recognized a new possibility that the Debtor could confirm a plan.

We first learned of the 1st Trust commitment on October 19, 1994, when the Debtor filed a Motion to obtain authority to (A) make a $6,750,000 loan from 1st Trust secured by a super-priority lien pursuant to 11 U.S.C. § 364(d)(1); (B) pay the allowed secured claim of Lincoln in satisfaction of Lincoln's Mortgage; and (C) file a further amended plan ("the Financing Motion"). In the Financing Motion, the Debtor expressed a primary purpose of securing the 1st Trust financing and paying off Lincoln's secured claim before submitting a further plan. We were unwilling to allow the Debtor to thusly "cram down" Lincoln out of the context of a bankruptcy plan. Furthermore, despite Lincoln's initial opposition to the Financing Motion, we were nonetheless hopeful that the parties would negotiate any perceived difficulties with the Debtor's seemingly substantial and attractive efforts to cash out Lincoln.[1] Thus, on November 17, 1994, we en-

---

1. As noted above, these hopes were not realized. Perhaps we should have anticipated Lincoln's pertinacity given the tone and content of its Answer to the Financing Motion filed on November 9, 1994. Therein, Lincoln complained, *inter alia,* that the cash-out contemplated by the Financing Motion would rob it of its election under 11

U.S.C. § 1111(b), an election which it declined to exercise in the past; was unlikely to exercise in any plan confirmation context, since it would loosen its grasp of an objection to confirmation under 11 U.S.C. § 1129(a)(10); and which it predictably opted not to exercise in conjunction with the Plan.

tered an order permitting the Debtor to file the Plan, but requiring that the financing/cash-out elements of the Financing Motion could be effectuated only through confirmation of a plan.

Our hope of an amicable resolution to this ongoing saga was diminished by Lincoln's filing the Valuation Motion on December 15, 1994, and a set of rather frivolous objections to the Debtor's disclosure statement ("the Disclosure Statement") on December 16, 1994. The Valuation Motion essentially argued that the Debtor underestimated Lincoln's secured claim in the Plan because it credited the value of post-petition Rents collected by Lincoln against Lincoln's secured claim instead of adding that value to the secured claim. Lincoln also argued that the Debtor failed to take into account post-petition appreciation of the Property and the funds contained in the Debtor's bank account ("the DIP Account"), which Lincoln claimed were derived from "its" Rents, when calculating its secured claim. The Debtor filed an answer the Valuation Motion on December 19, 1994.

With regard to the objections to the Disclosure Statement, we were not at all impressed with Lincoln's arguments. We therefore had little difficulty approving the Disclosure Statement in our Order of December 22, 1994, which established deadlines for events in the confirmation process, culminating in a confirmation hearing on January 25, 1995.

On December 27, 1994, in the midst of the process of voting on the Plan, Lincoln purchased the priority tax claim of the Montgomery County Tax Bureau ("the Bureau") for $234,903.22, its face amount. In conjunction with this purchase, the Bureau assigned its rights and interests in the claim to Lincoln, including its right to vote on the Plan.[2] Lincoln ultimately cast a ballot on behalf of the priority tax holder class rejecting the Plan. However, as established in unrebutted trial testimony, before Lincoln was able to cast that vote, but after it purchased the claim, the Debtor's counsel called the Bureau and solicited its vote directly. Although the Debtor's counsel identified himself by his firm affiliation, he did not indicate that he was counsel for the Debtor. The Bureau's representative, mistakenly believing that he was speaking with Lincoln's counsel, agreed to cast a ballot on behalf of the priority tax claim. The Debtor's counsel then completed a ballot accepting the Plan and sent it to the Bureau for signature. The Bureau's representative signed the ballot and returned it to the Debtor's counsel.[3] Thus, prior to the voting deadline, the Debtor received two conflicting ballots on behalf of the holder of the only Class 3 claim.

Not surprising, Lincoln filed Objections to confirmation of the Plan on January 18, 1995. Therein, Lincoln identified, first, two alleged

---

**2.** Because the Bureau held the only claim in Class 3 of Debtor's Plan, and because the claim was impaired by the Plan, we assume that Lincoln purchased the claim in order to foreclose the possibility that the Bureau would vote in favor of the Plan, thus supplying Debtor with an impaired accepting class, which is a prerequisite to confirmation under 11 U.S.C. §§ 1129(a)(10), (b)(1). Although we had earlier held that a class of unsecured priority tax claimants cannot serve as an impaired accepting class for the purposes of § 1129(a)(10), *see Union Meeting III,* 165 B.R. at 568–69, we did acknowledge a line of cases holding that a priority tax claim which is liened pre-petition becomes a secured claim falls outside of the scope of § 507(a)(7), and can be impaired under a plan. *Id.* at 569. *See, e.g., In re Venture Capital L.P.,* No. 91–13035, slip op. at 13–14 & n. 6 (Bankr.E.D.Pa. Feb. 16, 1993) (Fox, J.); and *In re General Development Corp.,* 135 B.R. 1008, 1011 n. 3 (Bankr.S.D. Fla.1991). Because the Debtor offered no evidence that the Bureau was a secured creditor and because its proposed treatment of the Bureau's claim comported with § 507(a)(7), we did not have to decide that issue at that time. Apparently fearing that, in connection with this Plan, the Debtor might try to take advantage of the principles expressed in *Venture Capital* and *General Development* (indeed, Debtor's proposed treatment of the Bureau's claim in its current Plan is consistent with the treatment of a secured claim), Lincoln purchased the claim from the Bureau and secured the right to cast the Bureau's vote on the Plan.

**3.** We are dismayed by the involvement of the Debtor's counsel in this episode. Although the Bureau's representative testified that counsel made *no affirmative misrepresentations,* it certainly appears that counsel was guilty of misrepresentation by omission. Such conduct might have supported our imposition of sanctions against counsel, and same would be imposed if any similar conduct were repeated in the future.

Plan defects, the underestimation of its secured claim and the payment of only seven (7%) percent interest on its newly acquired priority tax claim, which it claimed gave rise to confirmation infirmities under §§ 1129(a)(7), (a)(11), and (b)(2)(A). Lincoln also asserted that no eligible impaired accepting class had voted in favor of the Plan. *See* 11 U.S.C. §§ 1129(a)(10), (b)(1). Finally, Lincoln argued that the Plan violated the absolute priority rule as codified at § 1129(b)(2)(B)(ii) because the Debtor's equity holders are permitted to retain their equity interests in the Debtor without contributing adequate new value.

On January 20, 1995, the Debtor filed its Ballot Motion, seeking the invalidation of Lincoln's ballot filed on behalf of the priority tax claim. Therein, the Debtor argued that, pursuant to Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 3018(a), whoever held the Class 3 claim at the time that the Disclosure Statement was approved was the party entitled to vote the claim, which in this case was the Bureau. The Debtor's Ballot Motion also asked us to fix the amount of Lincoln's secured and unsecured claims for voting purposes. Lincoln's opposition to the Debtor's Ballot Motion expressed disagreement with the Debtor's analysis of F.R.B.P. 3018(a), as it pertained to its Class 3 claim ballot. Also, with respect to the issue of the amount of its secured and total claims, Lincoln stated that it was willing to have this court decide the amounts of same.

Finally, on January 23, 1995, Lincoln filed its Ballot Motion. Therein, Lincoln asked us to strike the Class 3 ballot filed by the Bureau, in light of the confusion described above, and to strike the ballots filed by Debtor's partners on account of their alleged unsecured claims. Lincoln correctly points out that, in *Union Meeting I*, 160 B.R. at 773–75; and *Union Meeting III*, 165 B.R. at 569, we had previously concluded that the partners' contributions were equity infusions and not unsecured loans.

As scheduled, we conducted a consolidated hearing on confirmation and the various pending motions on January 25, 1995. Lincoln elicited valuation testimony from its expert appraiser, Maureen Mastroieni. Lincoln also called a representative of the Bureau, Edward J. Wilkes, Jr., to testify about the circumstances of the Class 3 voting. The Debtor called its own appraiser, James J. Betoni, as well as its managing partner, Frank R. Iacobucci. After the hearing, we permitted both sides to simultaneously file briefs on all open issues by February 6, 1995, which deadline was ultimately continued until the following day on a request from the Debtor.

## C. DISCUSSION

### 1. *THE BUREAU'S BALLOT WHICH WAS CAST IN ERROR SHALL BE DISALLOWED, AND WE SHALL ONLY RECOGNIZE THE CLASS 3 BALLOT REJECTING THE PLAN CAST BY LINCOLN.*

■ In support of its argument that we should recognize only the Bureau's ballot, the Debtor, as noted above, relies on F.R.B.P. 3018(a) which provides, in part pertinent, that

> an equity security holder or creditor whose claim is based on a security of record shall not be entitled to accept or reject a plan unless the equity security holder or creditor is the holder of record of the security on the date the order approving the disclosure statement is entered.

Because the Bureau had not yet assigned its claim to Lincoln at the time that the Disclosure Statement was approved, the Debtor argues that only the Bureau had the right to cast a vote on behalf of the priority tax claim holder. Lincoln argues that the quoted portion of F.R.B.P. 3018(a) is not relevant because the priority tax claim is not based upon a "security of record." *See* 11 U.S.C. § 101(49) (definition of security). We conclude that Lincoln's position is correct.

The portion of F.R.B.P. 3018(a) quoted above establishes the bankruptcy equivalent of a record date, which is commonly used in general corporate governance. Because corporate securities are quite liquid, and in many cases publicly traded, it is often necessary to establish a date certain prior to an upcoming corporate vote, at which time the identities of all record holders of the compa-

ny's shares who are entitled to vote those shares at the upcoming meeting may be definitively determined. Such a procedure allows for the creation of a comprehensive list of eligible voters, which in turn facilitates proxy mailings and prevents multiple voting on single shares and last-minute transfers of voting rights. Because these types of logistic complexities may also be present when many interest holders are voting on a plan of reorganization, F.R.B.P. 3018(a) creates the equivalent of a record date in bankruptcy to effect the same remedy.

The plain language of F.R.B.P. 3018(a), however, makes it clear that the "bankruptcy record date" does not limit a transferee's right to vote a *claim*, but rather limits such a party's right to vote a *security interest* only. *Cf. In re Micron Products, Inc.*, 1992 WL 252124, slip op. at *2 (Bankr.E.D.Pa. Sept. 25, 1992). Although one could argue that transfers of claims are as likely to cause the same logistic problems with plan voting as transfers of securities, typically claims are not transferred *en masse*, and the likelihood of receiving multiple votes on one claim is far less likely. *Compare cf.* F.R.B.P. 3001(e) (establishing procedures to be followed in conjunction with the assignment of claims and interests). Indeed, the Debtor would not have received the superfluous vote of the Bureau were it not for its counsel's improper intrusion into the voting process. We see nothing in the Bankruptcy Rules or logic which would require us to recognize the ballot filed by the Bureau as opposed to the one filed by Lincoln.

■ We note that, even if the procedural rules would have us recognize the Bureau's ballot only, given the circumstances surrounding that vote and the equities of this matter, which surely do not favor the Debtor,

we would construe Lincoln's various pleadings on this issue, along with the Bureau's testimony, as a request to change the Bureau's vote to one rejecting the Plan, which is a request that we would grant. *See, e.g., In re American Solar King Corp.*, 90 B.R. 808, 827 (Bankr.W.D.Tex.1988). In the alternative, we would disallow the Bureau's ballot as well as Lincoln's. Because the Class 3 claim is impaired, and in the absence of an affirmative acceptance by the Class 3 claim holder, that class would be deemed to have rejected the Plan. *See* 11 U.S.C. § 1126(c).

■ Apparently realizing the weakness of its argument, the Debtor, in its final brief, abandons its F.R.B.P. 3018 argument and asserts, instead, that, when Lincoln paid the priority taxes at issue, that claim vanished along with the tax lien created by it.[4] Thus, argues the Debtor, there was no claim to transfer to Lincoln, and no Class 3 claim to vote.[5] The Debtor supports this conclusion by noting that it could find no statute permitting a taxing authority to transfer its tax claim. Moreover, the Debtor justifies this conclusion by noting that Lincoln would get its money's worth irrespective of its Class 3 vote, because the Bureau's tax lien, which would otherwise statutorily trump Lincoln's security interest in the Property, is removed.

We are not convinced by the Debtor's argument. We think the relevant question is not whether the law permits such an assignment, but rather, what law, if any, prevents it. The Debtor has pointed to none. Thus, we see no reason why Lincoln could not have legally and properly purchased the Bureau's claim, along with its lien position, as in the case of any other assignment of a secured claim. *Cf. In re Sensor Systems, Inc.*, 79 B.R. 623, 625–26 (Bankr.E.D.Pa.1987).[6]

4. The Debtor's assertion that the tax lien was automatically expunged is based on the statement of Wilkes that it is his belief that the Bureau no longer holds a lien on the Property for the taxes paid by Lincoln. This lay testimony, however, hardly proves the point.

5. This argument of the Debtor that the Class 3 claim has disappeared gets it no closer to identifying Class 3 as the impaired accepting class needed to satisfy § 1129(a)(10). It seems to us that the Debtor has therefore already resigned itself to finding an impaired accepting class else-

where, and would therefore prefer to see Class 3 disappear along with the confirmation objections raised by Lincoln in its role as the holder of the Class 3 claim.

6. Because the Debtor treats the Class 3 claim as a secured claim rather than as a priority claim under § 507(a)(7), this is not a case where a subrogee is attempting to assert the priority position of the governmental taxing authority in contravention of 11 U.S.C. § 507(d). *See, e.g., In re Davis*, 145 B.R. 499, 501 (Bankr.W.D.Pa.1992); *In re Henzler Manufacturing Corp.*, 89 B.R. 655,

In light of the equities surrounding this particular dispute, and without any legal argument compelling a contrary result, we will allow Lincoln's Class 3 ballot rejecting the Plan, and we will disallow the ballot mistakenly filed by the Bureau.

## 2. LINCOLN'S TOTAL CLAIM IS VALUED AT $9,364,186.65 AND THE SECURED PORTION OF THAT CLAIM IS VALUED AT $6,565,096.78.

### a. The aggregate amount of Lincoln's claim

Before we can determine the amount of Lincoln's secured and unsecured claims separately, we must first determine the aggregate amount of its entire allowed claim. It must come as no surprise that even this figure, which has remained more or less constant by consent of the parties throughout a good portion of this case, is now in dispute in light of Lincoln's recent assertion that it has significantly increased in the past year. Lincoln's original proof of claim, as was initially amended prior to the bar date ("the Original Claim"), indicates an aggregate claim in the amount of $9,346,186.65. This sum is apparently equal to the pre-petition judgment secured by Lincoln on its note. Approximately one month after the bar date passed, Lincoln filed a second amended proof of claim ("the Amended Claim"), this time indicating that its aggregate claim totaled $9,587,988.50. Although not explained on the face of the Amended Claim, the increase is apparently due to a recalculation of the claim using the default rate of interest contained in Lincoln's note. The Debtor filed an objection to the Amended Claim on December 23, 1993.

▪ As recently noted by Judge Sigmund of this court, an amendment to a proof of claim should be freely allowed, absent prejudice to the debtor or some other prevailing equitable considerations, as long as the original proof of claim provides adequate notice to the court of the existence, nature, and amount of the claim. *In re McMillan,* Bankr. No. 94–13221DWS, slip op. at 3–4 (Bankr.E.D.Pa. Feb. 7, 1994). *See also* cases cited therein.

▪ However, courts must be careful not to allow claimants to utilize post-bar date claim "amendments" to assert entirely new claims against a debtor. *Id.* When the claimant merely seeks to add pre-petition interest to, or otherwise increase the amount of, its previously-filed claim, courts will generally permit a post-bar date proof of claim amendment. *See, e.g., In re Hemingway Transport, Inc.,* 954 F.2d 1, 10 (1st Cir.1992) ("[A]s a general rule, amendments intended merely to *increase* the amount of a claim grounded in the same *right to payment* are not considered 'new' claims under the Code."); *United States v. Owens,* 84 B.R. 361, 363 (E.D.Pa.1988), *aff'g In re Owens,* 67 B.R. 418, 423 (Bankr.E.D.Pa.1986) (in the absence of contrary equitable considerations, amendments to claims should be freely permitted); *In re White Motor Corp.,* 59 B.R. 286, 288 (Bankr.N.D.Ohio 1986) (amendments increasing previously-filed claims are generally allowed); *In re Tri–State Homes, Inc.,* 56 B.R. 24, 27–28 (Bankr.W.D.Wis.1985) (claimant allowed to amend proof of claim to add amount of attorneys' fees and litigation expenses where promissory note permitting the collection of such costs was attached to the original proof of claim); and *In re Hertz,* 38 B.R. 215, 218–19 (Bankr.S.D.N.Y.1984) (claimant allowed to amend proof of claim to add pre-petition interest).

▪ The Debtor does not dispute that Lincoln is entitled to pre-petition interest, *see, e.g., In re Orsa Associates, Inc.,* 106 B.R. 418, 424 (Bankr.E.D.Pa.1989), nor does it quarrel with the general proposition that

---

657–58 (Bankr.N.D.Ohio 1988). The Debtor cannot treat the Class 3 claim as a secured claim in order to take advantage of the arguments advanced in *Venture Capital, supra;* and *General Development, supra, see* page 669 n. 2 *supra,* while characterizing the claim as a § 507(a)(7) priority claim for the purposes of § 507(d). In any event, even if § 507(d) applies, Lincoln is not technically a subrogee, but rather it is an assignee of the Bureau's claim. It has been held that § 507(d) does not prevent an assignee from asserting the priority originally enjoyed by the assignor. *See In re Missionary Baptist Foundation of America,* 667 F.2d 1244, 1246–47 (5th Cir. 1982). *See also* 3 COLLIER ON BANKRUPTCY, ¶ 507.07, at 507–48 (15th ed. 1994).

pre-petition interest may, in certain instances, be appropriately measured by the default rate. *See, e.g., In re Pikes Peak Water Co.,* 779 F.2d 1456, 1458–59 (10th Cir.1985); and *In re Grant Broadcasting of Philadelphia, Inc.,* 71 B.R. 376, 386 (Bankr.E.D.Pa.), *aff'd,* 75 B.R. 819 (E.D.Pa.1987) (by implication, both courts recognize that a claimant may be entitled to pre-petition interest at the default rate if permitted by, and under the terms of, its contract with the debtor). Rather, the Debtor argues that Lincoln's claim is based on its judgment, which in turn was calculated using the contract rate of interest, not the default rate. This fact complements the Debtor's second argument that Lincoln has used the amount of its judgment all along as the measure of its aggregate claim and should not be allowed to change the basis for calculation of its claim now. Although we think it a close question, we are inclined to agree with the Debtor.

This is not the case where a claimant has forgotten to add interest to its claim altogether, an error which should be immediately recognized by a debtor. *See, e.g., Hertz, supra,* 38 B.R. at 218–19. Instead, Lincoln asked for all components of its claim in the Original Claim, thus leading the Debtor to believe that the claim was complete. The use of the Original Claim figure in the many prior plans filed by the parties, as well as in several cash collateral stipulations, understandably cemented this expectation. Lincoln's request for an increased rate of interest at this late date is almost certainly tactical. In any event, Lincoln has all along slept on its right to demand the default rate of interest, and we will not permit it to rectify the situation now, when it "wakes up" after the bar date. Indeed, the very provision which permits Lincoln to charge the default rate of interest may well have merged into Lincoln's pre-petition judgment under controlling Third Circuit precedent. *See In re Stendardo,* 991 F.2d 1089, 1094–97 (3d Cir. 1993). *See also In re Johnson,* 140 B.R. 850, 853–56 (Bankr.E.D.Pa.1992) (claim is limited to amount of pre-petition judgment plus any properly assessed post-judgment costs and interest). We therefore shall fix Lincoln's aggregate claim at $9,364,186.65.

### b. *The value of the Property*

■ Throughout the first two years of this case, the parties agreed that the value of the Property could be fixed by this court at $6,600,000. In the past year, however, Lincoln commissioned its appraiser Mastroieni to perform an updated valuation of the Property. This time, Mastroieni has valued the Property at $7,200,000.

The updated valuation is not without support. The Debtor has acquired some fairly substantial new and renewed leases which, in certain instances, call for substantial physical improvements to the Property at the respective tenants' expense. Moreover, other indicators of property value, such as occupancy rate, have improved in the Blue Bell area. The real question faced by this court is whether these discrete factors warrant as much as a $600,000 increase in the Property's value in the past year.

■ The Debtor's appraiser Betoni acknowledged the improving occupancy rate and the new leases, but nonetheless concluded that these factors are more or less offset by increased expenses. Moreover, Betoni criticized Mastroieni for her use of actual tenant rollovers in the calculation of future vacancy rates. He preferred the use of a constant vacancy rate multiplier based on local historical averages.

■ We agree with Mastroieni that the actual rent roll of the Property should be taken into account when determining the Property's income-stream potential, and thus its value. We question, however, Mastroieni's other adjustments which, in large part, result in the dramatic increase in value reflected in her report. She was simply unable to identify any convincing basis for such a large increase in value in such a short period of time. On the other hand, we do not totally accept the assertion of Betoni that the acknowledged improvement of certain factors which generally increase the value of a real property have no effect on the bottom line in this case. Doing our best to weigh this highly technical and conflicting evidence, we

conclude that, as of the confirmation hearing,[7] the Property had a value of $6,800,000.

### c. The accumulated post-petition Rents

■ In our *Union Meeting I* decision, 160 B.R. at 765–67, we determined that all Rents from the Property accruing after Lincoln delivered its pre-petition rent demand notices to the tenants belonged to Lincoln. In large part, these Rents have accrued post-petition and totalled approximately $1,442,-380 as of the end of 1994. Because, in accordance with our *Union Meeting I* and *II* decisions, the Rents have been paid over to Lincoln, the Debtor has now urged us to "credit" the amount of these Rents against the value of the Property, thus decreasing the size of Lincoln's secured claim. Lincoln, on the other hand, asserted that the Rents are a separate piece of its collateral package which are not assumed in the value of the Property. Thus, Lincoln argued that the turnover of the Rents to it amounted to a liquidation of that particular piece of collateral only, thereby resulting in a "wash" which decreased the size of its overall claim, but which had no effect on the value of its security interest in the Property. In a nutshell, the parties have asked us to determine whether the Rents received by Lincoln throughout the course of this bankruptcy should be subtracted from the amount of its secured claim, or simply from the unsecured deficiency portion of Lincoln's claim.

The parties' dispute echoes a debate on this issue being waged in the case law. These cases, like the matter before us now, share a common fact pattern and ask a common question: how should the court apply post-petition payments from rents which are made to an undersecured mortgage lender whose collateral value is appreciating or remaining consent? This single question has spawned two lines of cases reaching opposite results. *Compare Confederation Life Insurance Co. v. Beau Rivage Ltd.*, 126 B.R. 632 (N.D.Ga.1991); *In re Kalian*, 169 B.R. 503 (Bankr.D.R.I.1994); *In re IPC Atlanta L.P.*, 142 B.R. 547 (Bankr.N.D.Ga.1992); *In re Oaks Partners, Ltd.*, 135 B.R. 440 (Bankr. N.D.Ga.1991); and *In re Reddington/Sunarrow L.P.*, 119 B.R. 809 (Bankr.D.N.M.1990) (all holding that post-petition rent payments to the undersecured creditor should be subtracted from the secured portion of the creditor's claim as measured by the value of the real estate) ("the Subtraction Cases"), *with Columbia Office, supra*, 175 B.R. 199; *In re Bloomingdale Partners*, 155 B.R. 961 (Bankr.N.D.Ill.1993); *In re Vermont Investment L.P.*, 142 B.R. 571 (Bankr.D.D.C.1992); *Landing Associates, supra*, 122 B.R. at 294–97; and *In re Flagler-At-First Associates, Ltd.*, 114 B.R. 297 (Bankr.S.D.Fla.1990) (all holding that the amount of post-petition rents not reinvested into real estate increase the size of the creditor's secured claim, and payment of those rents to the creditor results in a "wash" of that discrete increase, which in turn decreases the total amount of the creditor's claim but not the secured portion of its claim as measured by the value of the real estate) ("the Addition Cases").

The Subtraction Cases, many of which are clustered in one court, the Northern District of Georgia, rely heavily on the Supreme Court's decision in *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). In *Timbers*, the Court held that an undersecured creditor whose collateral is appreciating in value is not entitled adequate protection payments due to its lost right to take immediate possession of the collateral. *Id.* at 369–76, 108 S.Ct. at 629–33. Extrapolating from this holding, the Subtraction Cases conclude that, unless the rent payments received by the mortgage lender during the course of the bankruptcy are subtracted from the value of the lender's interest in the real property, they would constitute adequate protection payments in favor of an undersecured claim, in contravention to the dictates of *Timbers. Beau Rivage, supra*, 126 B.R. at 638–41; *Kalian, supra*, 169 B.R. at 504–06; *IPC At-*

---

**7.** For the purposes of confirmation, secured creditors' collateral must be valued at the time of confirmation. *See, e.g., In re Jablonski*, 88 B.R. 652, 657 n. 5 (E.D.Pa.1988); *In re Columbia Office Associates L.P.*, 175 B.R. 199, 202 (Bankr. D.Md.1994); *In re Landing Associates, Ltd.*, 122 B.R. 288, 292 (Bankr.W.D.Tex.1990); *In re Seip*, 116 B.R. 709, 710–11 (Bankr.D.Neb.1990); and *In re 222 Liberty Associates*, 105 B.R. 798, 801 (Bankr.E.D.Pa.1989).

*lanta, supra,* 142 B.R. at 558–59; *Oaks Partners, supra,* 135 B.R. at 449–51; and *Reddington/Sunarrow, supra,* 119 B.R. at 813–14. Otherwise, they argue, the value of the rent payments would be applied against the lender's claim in addition to the value of the real estate, thus improving the undersecured lender's collateral position as the bankruptcy case progresses, a result that is contrary to the principles enunciated in *Timbers.* See *Beau Rivage, supra,* 126 B.R. at 640; *IPC Atlanta, supra,* 142 B.R. at 559; *Oaks Partners, supra,* 135 B.R. at 450; and *Reddington/Sunarrow, supra,* 119 B.R. at 814.

The Addition Cases, on the other hand, argue that a mortgage lender's entitlement to the rents is controlled by 11 U.S.C. § 552(b). Thus, they assert, the Code itself provides for the post-petition increase in the value of the creditor's secured claim under the circumstances encompassed by that provision. These cases attempt to reconcile *Timbers* by noting that, in that case, the Court was addressing the propriety of giving an undersecured creditor interest to compensate for its lost "use value," not the propriety of paying over rents which are encumbered by the creditor's security interest through ·§ 552(b).

After carefully reviewing *Timbers,* the cases cited above, and § 552(b), we join the ranks of the Addition Cases, although not without a certain amount of trepidation. We agree with the Addition Cases that § 552(b) does permit, under certain circumstances, the growth of an undersecured creditor's secured claim post-petition as indicated in the following language thereof:

> if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, *rents,* or profits of such property, then such security interest extends to such proceeds, product, offspring, *rents,* or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law ... (emphasis added).

It stands to reason, then, that an undersecured creditor's secured claim ·increases as "proceeds, product, offspring, rents, [and] profits" accrue post-petition. When the Subtraction Cases claim that this post-petition inflation is contrary to *Timbers* and congressional intent, they are guilty of quoting *Timbers* out of context. In fact, the Court stated therein that

> [i]n subsection (a) of [§ 506, which defines a creditor's secured claim] the creditor's "interest in property" obviously means his security interest without taking account of his right to immediate possession of the collateral on default. If the latter were included, the "value of such creditor's interest" would increase, and the proportions of the claim that are secured and unsecured would alter, as the stay continues.... No one suggests this was intended. The phrase "value of such creditor's interest" in § 506(a) means "the value of the collateral."

484 U.S. at 372, 108 S.Ct. at 631 (citations to legislative history omitted). Therefore, the Court said only that the secured portion of a creditor's claim could not be augmented post-petition by payments intended to compensate the creditor for lost use value. This passage does not address the situation where a secured claim grows post-petition due to the operation of § 552(b), or even due to the happenstance of appreciation. *Cf. Dewsnup v. Timm,* 502 U.S. 410, 417, 112 S.Ct. 773, 778, 116 L.Ed.2d 903 (1992) ("Any increase over the judicially determined valuation during bankruptcy rightly accrues to the benefit of the creditor, not to the benefit of the debtor and not to the benefit of other unsecured creditors."). A broad reading of *Timbers* would prohibit all post-petition increases in a creditor's security, and could not be reconciled with § 552(b) and other Supreme Court cases. We will not adopt such a reading.

We find some support for our conclusion in the *Timbers* decision itself. First, we note that the Court may have been making a distinction between use value payments and rent payments when it stated that

> [the debtor] had agreed to pay [the secured creditor] the postpetition rents from

the apartment project (covered by the after-acquired property clause in the security agreement), minus operating expenses. *[The secured creditor] contended, however, that it was entitled to additional compensation [for lost use value].* The Bankruptcy Court agreed and ... it conditioned continuance of the stay on monthly payments by respondent, at the market rate of 12% per annum, on the estimated amount realizable on foreclosure ... commencing six months after the filing of the bankruptcy petition, to reflect the normal foreclosure delays.

484 U.S. at 368–69, 108 S.Ct. at 629 (emphasis added). According to this recitation, the adequate protection payments which were the subject of the Court's opinion appear to have been made in addition to rent payments. Unfortunately, even this simple factual point is rendered uncertain by the *Timbers* bankruptcy court's conclusion that "the postpetition rents could be applied to [the lost use value] payments." *Id.* at 369, 108 S.Ct. at 629.

Undaunted, we probe further into the *Timbers* opinion and find the following passage of note:

[The secured creditor's] interpretation of § 362(d)(1) is structurally inconsistent with 11 U.S.C. § 552. Section 552(a) states the general rule that a prepetition security interest does not reach property acquired by the estate or debtor postpetition. Section 552(b) sets forth the exception, allowing postpetition "proceeds, product, offspring, rents, or profits" of the collateral to be covered only if the security agreement expressly provides for an interest in such property, and the interest has been perfected under "applicable nonbankruptcy law." *Section 552(b) therefore makes possession of a perfected security interest in postpetition rents or profits from collateral a condition of having them applied to satisfying the claim of the secured creditor ahead of the claims of the unsecured creditors. Under [creditor's] interpretation, however, the undersecured creditor who lacks such a perfected security interest in effect achieves the same result by demanding the "use value" of his collateral under § 362.*

*Id.* at 374, 108 S.Ct. at 632 (emphasis added, citations omitted). In this passage, the Court is clearly drawing a distinction between an undersecured creditor with § 552(b) rights, and such a creditor which is relying only on 11 U.S.C. § 362 to recoup its lost use value. According to the Supreme Court, the former *may* apply post-petition rents to its claim (note, the Court does not say "secured claim") ahead of the unsecured creditors, while the latter may not.

■ At least one court, *i.e., Kalian, supra,* 169 B.R. at 506, has criticized the conclusion we reach today, claiming that such an interpretation on *Timbers* and § 552(b) would "render § 506(b) meaningless." However, we respectfully disagree with the reasoning of *Kalian* on this point. The *Kalian* court's criticism assumes that the post-petition rent payments amount to interest payments on the secured portion of an undersecured creditor's claim. Such a situation would indeed violate § 506(b). On the other hand, we consider the rent payments to be nothing more than advance payments on account of the creditor's secured claim resulting from a "liquidation" of part of that creditor's collateral, *i.e.,* the rents themselves.[8] We see this situation as analogous to a debtor who sells a machine preconfirmation and turns over the proceeds to its equipment lender who is secured by the machine and other pieces of collateral. In that instance,

---

**8.** This conclusion results in the "wash" notion first articulated by the court in *Flagler, supra,* 114 B.R. at 302. This view of rents and real property as separate pieces of collateral is consistent with our separate treatment and valuation of a secured creditor's lease rejection damages in our recent Opinion in *In re After Six, Inc.,* 177 B.R. 219, 230–32 (Bankr.E.D.Pa.1995). Furthermore, while we acknowledge that real estate valuation by the income approach already takes into account the income stream produced by the property, collateral valuation for confirmation purposes occurs as of the confirmation date, *see* page 674 n. 7 *supra,* and, therefore, considers only the value of the income stream from that point forward. *See Columbia Office, supra,* 175 B.R. at 199 n. 3. Thus, when we add the Rents, which all accrued pre-confirmation, to the value of the Property in order to determine Lincoln's total secured claim, we are not guilty of doubling the value of those Rents.

the proceeds from the sale are not set off against the value of the remaining collateral.[9]

■ Furthermore, we note that, under the holdings of *Commerce Bank v. Mountain View Village, Inc.*, 5 F.3d 34, 37–39 (3d Cir. 1993); and the Opinions in *Union Meeting I, III,* and *IV,* in contrast to the state laws in effect in *Timbers* or any of the Subtraction or Addition Cases, there has been a definitive determination made that, under controlling Pennsylvania state law, Lincoln *owns* the Rents at issue. We think that this fact also leads inevitably to the conclusion that the Rent payments in this case did not amount to mere interest payments compensating Lincoln for its lost right of immediate access to the Property. The Rents became the property of Lincoln upon their payment by the tenants, quite apart from any consideration of the value of the Property.

Based on the above analyses, we conclude that the Rents received by Lincoln post-petition should be subtracted from the amount of its aggregate claim, but not from the amount of the secured portion of its claim. *Accord,* the Addition Cases cited at page 674 *supra.*

### d. *The funds contained in the DIP Account*

■ Lincoln claims that the funds contained in the DIP Account are derived from their Rents, and, therefore, based on the decisions in *Union Meeting I, III,* and *IV,* and for the reasons discussed in the immediately preceding section of this Opinion, they should be turned over to Lincoln and credited against its unsecured, deficiency claim. The Debtor, on the other hand, argues that Lincoln never established the origins of the money contained in the DIP Account. In

fact, the Debtor hints, without alleging outright, that the funds may have come from contributions made by the Debtor's partners. In any event, the Debtor argues that the funds in the DIP Account are unencumbered and may be used by the Debtor in its Plan.

■ Lincoln bears the ultimate burden of proving the validity and amount of its claim as well as the validity of its security interests in the Debtor's property. *See, e.g., In re Allegheny International, Inc.,* 954 F.2d 167, 173–74 (3d Cir.1992); *In re Grant Broadcasting of Philadelphia, Inc.,* 75 B.R. 819, 822–23 (E.D.Pa.1987); *In re Richard Buick, Inc.,* 126 B.R. 840, 851 (Bankr.E.D.Pa.1991); and *In re Leedy Mortgage, Inc.,* 111 B.R. 488, 491 (Bankr.E.D.Pa.1990). We have combed the record of this confirmation hearing, as well as those created in conjunction with the several earlier confirmation hearings conducted in this case, and find that the origins of the DIP Account funds have not been traced by Lincoln or any other party. Although the Rents generated by the Property seem a likely source of these funds, the Debtor has suggested an alternative, equally plausible source, *i.e.,* contributions from its partners. In any event, the burden of proof on this issue must be shouldered by Lincoln. It has failed to carry its burden and we therefore conclude that the funds contained in the DIP Account belong to the Debtor.

### e. *Calculation of the amounts of Lincoln's secured and unsecured claims for voting and confirmation purposes*

As noted above, we conclude that Lincoln's aggregate claim equals $9,364,186.65. Of this amount, its secured claim equals $6,565,096.78, calculated by deducting the $234,903.22 of prior liens[10] from the $6,800,000

---

9. Of course, it is possible that a creditor's secured claim which is expanding under § 552(b) may become so large as to eat up any deficiency and call into play § 506(b). At that point, the creditor would become entitled to interest on its claim. Any rents collected beyond that, however, would revert to the debtor. To the extent that a secured creditor would keep on collecting the rents beyond this point, the debtor would begin to realize a dollar for dollar equity in the other collateral, generally the real property. A creditor, after all, is not entitled to more than the amount of its claim plus interest and any properly assessed costs.

10. *See 222 Liberty, supra,* 105 B.R. at 801 ("There is no question, in studying the mass of § 506 determinations which have emanated from this court, that any prior liens, such as tax liens, must be deducted from the fair market value in computing the amount of the putative secured creditor's allowed secured claim under the Code section."). Now that Lincoln owns the claim responsible for the prior lien, it will recoup this amount when its Class 3 claim is paid.

value of the Property. Lincoln's unsecured claim equals $1,356,709.87, calculated by deducting, from its $9,364,186.65 total claim, the $6,565,096.78 secured claim and the $1,442,380 total amount of Rents collected and applied as of December 31, 1994.[11]

### 3. THE DEBTOR'S PLAN CANNOT BE CONFIRMED.

In light of the Debtor's new Plan funding source, and as a result of the Debtor's other Plan modifications, Lincoln cannot continue to repeat many of the same Plan objections that it did in the past. For the most part, Lincoln is unable to identify any irreparable defects in the Plan. However, as intimated above, the Debtor was once again unable to secure the acceptance of an impaired class. See 11 U.S.C. § 1129(a)(10). Because Lincoln objects to the Plan on this ground, we must deny confirmation of the Plan.

#### a. Lincoln's Non-§ 1129(a)(10) Confirmation Objections Do Not Appear Meritorious

■ First we briefly consider Lincoln's objections to confirmation which are not based on § 1129(a)(10). Lincoln argues that the Debtor's miscalculation of its secured and unsecured claims cause a number of confirmation problems and call into question the feasibility of the Plan. We note, however, that the Plan expressly provides for the contingency that our valuation of the claims might not match the Debtor's estimations. The Plan, in contemplation of this contingency, provides that the partners will contribute more money to offset any deficiencies based on our valuations of the claims. Thus, if feasibility were the only Plan defect alleged by Lincoln, we would give the Debtor an opportunity to obtain additional capital from its partners and modify the Plan to take into account Lincoln's claims, as determined herein.

■ Next, Lincoln asserts, without the support of case citations or legal analysis, that it is not receiving as much under the Plan on account of its Class 3 claim as it would in a Chapter 7 liquidation because Debtor only proposes to pay interest on the claim, through the effective date of the Plan, at a rate of seven (7%) percent, as opposed to the statutory rate of nine (9%) percent. However, because the hypothetical liquidation of § 1129(a)(7) would take place on the petition date, cf. Union Meeting II, 163 B.R. at 237–38 & n. 3, any interest for the period that follows is arguably above and beyond what the claimant would receive in a Chapter 7 liquidation. In any event, even if nine (9%) percent is the appropriate interest rate to be applied to this claim, the difference is not great, and to remedy such a minor and easily correctable defect, we would give the Debtor an opportunity to modify its Plan.

Finally, Lincoln claims that the Plan violates the absolute priority rule, which is codified in § 1129(b)(2)(B), by allowing the partners to retain their equity interests in the Debtor without contributing adequate new value. See In re Wynnefield Manor Associates, L.P., 163 B.R. 53, 56–59 (Bankr.E.D.Pa. 1993). This issue was noted as a meritorious Objection to confirmation of the prior plan in Union Meeting III, 165 B.R. at 570–71.

However, there is no question that the partners have agreed to contribute more "new value" under the terms of the instant Plan than they have under the terms of past plans. For example, the Plan provides that they will contribute as much as $365,000 to meet funding shortfalls, as opposed to $200,000 in the case of the immediately-previous plan. According to the Plan and the testimony of Iacobucci, the partners may be willing and able to pay even more if necessary to achieve confirmation. Furthermore, in order to secure the 1st Trust financing, the partners have paid a $100,000 commitment fee. They have also granted 1st Trust a security interest in some of their other, non-Debtor property, and they have agreed to guarantee the 1st Trust Loan. We disagree with Debtor's assertion that this "new value" equals the actual cash layout plus the amount of the Firstrust loan, or approximately $7,000,000, since the nature of some of this "new value"

---

**11.** Of course, this number has already grown larger. Because any differences caused by subsequent Rent collections would not alter the outcome of our decision, we use the Rent figure as of December 31, 1994, as a convenience.

does not appear to qualify as "money or money's worth." *See Union Meeting III*, 165 B.R. at 570–71; and *Wynnefield Manor*, *supra*, 163 B.R. at 56. However, the sum contribution is certainly more substantial than anything the partners have offered in the past. We decline to delve into this very close and difficult issue regarding application of the "new value exception" to the absolute priority rule any further in light of our determinative conclusion that confirmation must be denied on the basis of § 1129(a)(10).

### b. *Lincoln's § 1129(a)(10) Confirmation Objection Is Meritorious*

Finally, we consider the Debtor's old nemesis, § 1129(a)(10), which provides as follows: "[i]f a class of claims is impaired under the plan, [the court shall *confirm* the plan only if] at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." The Debtor asserts that three eligible impaired classes have accepted the Plan, (1) the Class 2 wholly unsecured second mortgage claim of E. F. Hansen, Jr. and Eileen Hansen ("the Hansens"); (2) the Class 3 priority tax claim; and (3) the Class 6 unsecured creditor claims. As concluded above, we will not recognize the Bureau's Class 3 ballot accepting the Plan, and, therefore, we need only consider the issues of whether Classes 2 and 6 have accepted the Plan.

We have, in the past, held that the Class 2 claim of the Hansens, who are the former owners of the Property and the holders of a $316,820 claim based on a purchase-money mortgage subordinated to Lincoln's mortgage, was not properly classified in the Debtor's prior plans apart from the claims of general unsecured creditors. *See Union Meeting III*, 165 B.R. at 568. This conclusion was expressly affirmed by the district court. *See Union Meeting IV*, slip op. at 7–8. *Cf. Union Meeting I*, 160 B.R. at 773 (Lincoln properly included the Hansens' claim in the class of unsecured creditors in its competing plan). Under "the law of the case" doctrine, it appears that, absent a clearly erroneous decision on our part, we should refuse to "reopen what has already been decided." *In re Cole*, 89 B.R. 433, 436

(Bankr.E.D.Pa.1988). *Accord In re Sacred Heart Hospital of Norristown*, 177 B.R. 16, 23 (Bankr.E.D.Pa.1995); and *In re River Village Associates*, 161 B.R. 127, 134–35 (Bankr.E.D.Pa.1993). To the extent that the Debtor presents the same arguments and explanations for its separate treatment of the Class 2 claim as we already considered and rejected in denying confirmation of prior plans, we will not reconsider them now.

We note, however, that the conclusions reached on this issue in both *Union Meeting III* and *IV* were limited to rejection of the particular justifications for separate treatment of the Hansens' claim articulated by the Debtor at that time. Neither decision concluded that *no* reason could be given to justify the separate classification of the Class 2 claim. *See Union Meeting IV*, slip op. at 8 ("Therefore, absent the Debtor's proffer of another reason to create a separate class to house the second mortgage lien, Class 3 [now Class 2] should not have been an independent class."); and *Union Meeting III*, 165 B.R. at 568 ("It therefore appears that the Debtor was obliged to make a stronger argument than it has for separately classifying [the Class 2] deficiency claim if it hoped to avoid the criticism that its classification ... was motivated by its desire to circumvent § 1129(a)(10)."). This time, the Debtor has articulated a different, and better, reason to separately classify the Class 2 claim, which we must consider.

The Debtor now points out that a *wholly unsecured* mortgage claim, unlike the unsecured portion of an *undersecured* mortgage claim, maintains its subordinate lien on its collateral if not bifurcated under the Code. The Debtor notes that Lincoln has taken no action to bifurcate the lien of the Class 2 claimant. Therefore, the Debtor concludes, the Class 2 claim is different from the general unsecured claims in that it has a lien which can pass through the bankruptcy unaffected. *See Dewsnup, supra*, 502 U.S. at 419, 112 S.Ct. at 779. While Debtor's observation may be true, pointing out claim distinctions for their own sake "begs the relevant question: why is this a reasonable scheme for measuring creditors' votes?" *John Hancock Mutual Life Ins. Co. v. Route*

*37 Business Park Associates,* 987 F.2d 154, 161 (3d Cir.1993).

▮ The Debtor tries to take the next step required by *John Hancock, supra,* by noting that it was required to bifurcate this lien itself, through the Plan, in order to secure the 1st Trust financing. Again, even if this is true (although we are not sure why 1st Trust would insist on the removal of this lien if its proposed financing was to be approved by this court on a priority basis as requested, *see* 11 U.S.C. § 364(d)), we fail to see the connection between this fact and the necessity to separately classify this claim. The Debtor obviously did not have to "pay" the Hansens anything for the loss of their lien.[12] As in the Debtor's prior plans, the Plan provides that the Hansens will receive the exact same treatment as the Debtor's other general unsecured creditors. We conclude that the Debtor did not have to treat the Class 2 claim more favorably in return for bifurcation of its lien, and therefore the separate classification of the Hansens' claim was not required.

With all other possibilities removed, we again conclude that the separate classification of the Class 2 claim could only have been "motivated by [Debtor's] desire to circumvent § 1129(a)(10)." *Union Meeting III,* 165 B.R. at 568.

▮ The Debtor cites to one case in which a debtor was allowed to separately classify the claim of a wholly unsecured junior mortgagee, *In re Stratford Associates, L.P.,* 145 B.R. 689, 692 & n. 3, 695 (Bankr. D.Kan.1992). Although the *Stratford Associates* court's explanation is terse, it appears that the separate classification was allowed because the junior mortgagee had already made an election under 11 U.S.C. § 1111(b). *Id.* at 695. We note, however, that an § 1111(b) election is not available to a claimant whose "interest on account of [its] claims in [the debtor's] property is of inconsequen-

tial value...." 11 U.S.C. § 1111(b)(1)(B)(i). The wholly unsecured junior mortgagee is a classic example of a claimant not entitled to make an § 1111(b) election under the exception quoted above. *See, e.g., In re Rosage,* 82 B.R. 389, 390–91 (Bankr.W.D.Pa.1987); and *In re Baxley,* 72 B.R. 195, 198–99 (Bankr. D.S.C.1986). We therefore find the predicate, and thus the holding, of the *Stratford Associates* case suspect.

▮ In the alternative, the Debtor asserts that, if Lincoln is correct and the Rents are subtracted from its unsecured deficiency claim, then Lincoln's resulting unsecured claim will not be large enough to dictate the vote of Class 6 containing the general unsecured claims. Our calculations do not bear this out. First, despite the Debtor's newly proffered evidence, *i.e.,* the introduction of a note and the Partnership Agreement reciting a debt of the Debtor to the parties for their contributions, we remain unconvinced that the partners' contributions were unsecured loans instead of equity contributions. The dealings between the Debtor partnership and its partners were insider dealings which may have significance in evaluating the interests of the partners *inter se* in the equity of the Debtor. However, they are not arm's length loan transactions with third-party creditors. In light of our prior holdings that the partners' claims are in fact equity contributions, *see Union Meeting III,* 165 B.R. at 576–77 (holding that the *Union Meeting I* decision on this issue is itself the "law of the case");[13] and *Union Meeting I,* 160 B.R. at 773–75, and the rather insignificant weight of the new evidence to the contrary, *compare Sacred Heart Hospital, supra,* 177 B.R. at 23, it seems quite clear that the "law of the case," *see* page 679 *supra,* would require us to not consider the amount of these "claims" before performing our calculations of votes of Class 6. Furthermore, because the partners are insiders of the Debtor, we could not count their votes on their unsecured claims even if

---

**12.** Our conclusion is supported by the fact that the existence of the Hansens' lien did not provide the Hansens with any real leverage in any event. A debtor's right to bifurcate a creditor's lien into its secured and unsecured portions and "strip down" a totally undersecured claim to an unsecured claim in a Chapter 11 case is unqualified.

*See* 11 U.S.C. § 506(a); and *In re DeSeno,* 17 F.3d 642, 644–46 (3d Cir.1994).

**13.** This issue is not discussed in *Union Meeting IV,* leading us to suspect that the Debtor abandoned any dispute of this decision on appeal.

they were otherwise valid. *See* § 1129(a)(10), as quoted at page 679 *supra* (acceptance of the plan by insiders cannot be considered in an § 1129(a)(10) analysis). Thus, based on our calculations after the removal of the partner's "unsecured" claims, we are compelled to conclude that only about thirty (30%) percent of the total amount of voting unsecured claims in Class 6 accepted the Plan. Hence, the Plan was rejected by that class as well. *See* 11 U.S.C. § 1126(c).

Because neither Classes 2, 3 or 6 constitute eligible impaired classes which have voted to accept the Plan, the Plan has failed to meet the requirement of 11 U.S.C. § 1129(a)(10). We must therefore deny confirmation of the Plan on this ground.

### D. CONCLUSION

 Although we are not willing to go so far as to say that no single asset debtor should be allowed to reorganize under Chapter 11, this court's exercises in this case poignantly illustrate the futility and waste of many such cases. Under the caselaw developed, whether intentionally or not, by the Third Circuit Court of Appeals, it is certainly made difficult for such a debtor to "cram down" a plan opposed by the debtor's primary secured lender. *See In re Swedeland Development Group, Inc.,* 16 F.3d 552, 568 (3d Cir.1994) (en banc) (unanimously reiterates the holdings limiting a debtor's classification options in *John Hancock, supra,* which is ominous to a single-asset debtor); and *Mountain View, supra.* *Cf.* J. Krause, *The Bias of the Court's Against Single–Asset Real Estate Cases Is Creating Bad Law in the Area of Classification,* 22 CALIF.BANKR.J. 47 (1994). The Bankruptcy Code, as interpreted by these cases, will not often provide a single-asset debtor with enough flexibility to reorganize against the opposition, even if irrational in nature, of an undersecured mortgage lender. *But cf. River Village Associates, supra,* 161 B.R. at 141 (a single-asset debtor may be able to "create" an impaired class of tenants and thereby escape the death-clutch of § 1129(a)(10)).[14]

Thus, unless the primary, and often the only, parties of real interest to the case approach the single-asset, single-lender bankruptcy in the spirit of cooperation, the bankruptcy court is left to mediate nasty and costly two-party dispute which the creditor can always win if it is nasty and stubborn enough.

Single-asset partners often contribute a great deal of money and "sweat equity" to their real estate projects, and their desire to preserve any equity potential is understandable. On the other hand, we can also sympathize with mortgage lenders who have loaned great sums of money and simply want some of the benefit of their bargains in a down-sized real estate market. Despite these rational objectives, we do not believe that the bankruptcy Code, under the caselaw as it has developed in this Circuit, is the most feasible tool to utilize to resolve these types of disputes. The normal societal gains from business reorganizations, *i.e.,* protecting jobs and/or maintaining economic stability, *compare In re Mayer Pollock Steel Corp.,* 174 B.R. 414, 422–23 (Bankr.E.D.Pa.1994), are often absent in single-asset cases. The number of other players requiring the protection of the even playing field created by the Code is small. Often, no other parties-in-interest, such as the tenants, are the least bit concerned with the outcome under this process.

Given the small benefit to be gained from many of these single asset cases, it is hard to justify the costs of dollars and time which mount when these cases drag on. The instant bankruptcy case has been pending for over two years. We have been asked to consider seven plans of reorganization and, in the process, have had to dispose of countless motions and objections. This case alone has now generated four lengthy opinions at this level and has required the intervention of two levels of appellate courts. This outpouring of labor is justified only as a one-time project to guide similarly-situated parties in the future. All the while, administrative expenses continue to climb in this case, eating away any unencumbered assets which might otherwise be available to the unsecured creditors and

---

**14.** The instant Debtor was apparently unable to impair its tenants' claims, either because the absence of security deposits meant that its tenants were not creditors, or it lacked confidence concerning the continued satisfaction of its valued tenants if it impaired their claims, or both.

any value which might otherwise be created by the acquisition of attractive new tenants or small recoveries by the local real estate market.

■ We have the continued authority and the obligation to preside over this particular case, and we cannot allow this futile process to continue any longer. If and when we are freed from the District Court's stay order, we will immediately convert this case to a Chapter 7 case. In the meanwhile, we will not consider any further plans of reorganization in this case unless they are supported by both the Debtor and Lincoln, nor much at all in this case unless the doubtful prospect that the Court of Appeals will infuse single-asset cases by limiting its former holdings occurs in the resolution of the appeals in this case which are presently before that Court.

An Order consistent with this Opinion shall be entered.

### ORDER

AND NOW, this 14th day of February, 1995, upon consideration of (1) the request of UNION MEETING PARTNERS ("the Debtor") to confirm its Fourth Amended Plan of Reorganization ("the Plan") over the objection of its primary mortgage lender, Lincoln National Life Insurance Co. ("Lincoln"); (2) Lincoln's Motion for Valuation of Secured Claim ("the Valuation Motion"); (3) the Debtor's Motion Pursuant to 11 U.S.C. § 1126(e) to Designate Ballot Submitted by Lincoln in Class 3 and to Fix the Amount of Lincoln's Claim for Voting Purposes under Class 1 and Class 6, Pursuant to Bankruptcy Rule 3018 ("the Debtor's Ballot Motion"); and (4) Lincoln's Expedited Motion to Strike Ballots of the Montgomery County Tax Claim Bureau and the Debtor's General Partners ("Lincoln's Ballot Motion"), and upon careful review of all pleadings; the record made, including a consolidated hearing on all of the above matters on January 25, 1995; and the parties' post-trial briefs, it is hereby ORDERED AND DECREED as follows:

1. Lincoln's aggregate claim is fixed at $9,364,186.65. Its remaining secured claim is fixed at $6,565,096.78. Its net unsecured claim is fixed at $1,356,709.87. The difference between the amount of Lincoln's aggregate claim and the sum of its secured and unsecured claims represents the amount of rent payments already advanced to Lincoln throughout the course of this case and payments to be received on account of its Class 3 claim.

2. The Debtor's Ballot Motion is DENIED IN PART AND GRANTED IN PART. We will not disallow the ballot filed by Lincoln on behalf of the Class 3 claim, but instead, shall disallow the Class 3 claim mistakenly filed by the Montgomery County Tax Bureau ("the Bureau"). For the purposes of Plan voting, Lincoln's secured and unsecured claims shall equal the amounts set forth in paragraph 1 of this Order.

3. Lincoln's Ballot Motion is GRANTED. As noted in paragraph 2 of this Order, the Class 3 ballot mistakenly filed by the Bureau is disallowed. Further, the Class 6 unsecured claim ballots filed by the partners on behalf of what this court has already determined to be equity contributions shall be disallowed.

4. Confirmation of the Plan is DENIED.

5. Unless a motion consistent with this Opinion requesting a different disposition is made and if the stay of our prior Orders is dissolved, this case shall be immediately, without further notice or hearing, converted to a Chapter 7 case and Lincoln will be permitted to proceed to exercise its state-law rights in reference to the Debtor's real property located at 920A and 920B Harvest Drive, Blue Bell, Pennsylvania.