**BEAL BANK, S.S.B., Appellant,**

v.

**WATERS EDGE LIMITED PARTNERSHIP,**
Appellee.

Nos. Civ.A. 98–40185PBS–39, Civ.A. 98–40211PBS–28, Civ.A. 98–40099PBS–20, Civ.A. 98–40160PBS–27.

United States District Court,
D. Massachusetts.

April 11, 2000.

Charles R. Gibbs, Akin, Gump, Strauss, Hauer & Feld, Dallas, TX, Andrew E. Jillson, Susan D. Frieze, Jenkens & Gilchrist, Dallas, TX, William V. Sopp, Finnegan, Hickey, Dinsmoor & Johnson, P.C., Boston, MA, for Beal Bank, S.S.B., appellant.

William R. Baldiga, Brown, Rudnick, Boston, MA, Michael R. Pinta, Rappaport, Freeman & Pinta, Boston, MA, Kara J. Lane, Mark S. Baldwin, Brown, Rudnick, Freed & Gesmer, Hartford, CT, for Water's Edge Limited Partnership, appellee.

Steven D. Pohl, Brown, Rudnick, Boston, MA, for Water's Edge Limited Partnership, debtor.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### I. *INTRODUCTION*

Appellant, Beal Bank S.S.B. ("Beal"), challenges the Chapter 11 reorganization of the appellee, Water's Edge Limited Partnership ("WELP"), which owns three apartment buildings in Revere, Massachusetts. Among other things, Beal claims that the bankruptcy court erred by: 1) confirming the cramdown reorganization plan which permitted the private sale of the equity in the single asset real estate partnership to an insider plan sponsor; 2) authorizing WELP to use post-petition rent to make payments to Beal, an undersecured creditor, which were subtracted from Beal's secured claim; 3) denying Beal's motion to disqualify WELP's counsel because the firm represented both the plan sponsor and the debtor; and 4) authorizing WELP to pay pre-petition legal fees without adequate scrutiny. The Court has jurisdiction over this consolidated appeal pursuant to 28 U.S.C. § 158(a).

After hearing, and a review of the extensive record, the court *AFFIRMS* all the bankruptcy court's orders save two. First, the Court *REVERSES* the bankruptcy court's valuation of Beal's secured claim on the ground that the cash collateral (the post-petition rents) should have been added to the value of the secured claim. The Court also *REMANDS* the case to reassess the plan's feasibility based on the secured claim's new value. Second, because the bankruptcy court did not expressly consider the appearance of conflict

in his analysis of the motion to disqualify WELP'S counsel, the Court **REMANDS** that appeal to the bankruptcy court for further consideration.

## II. *FACTS*

### A. *Background*

The appellee, the Water's Edge Limited Partnership, is a single asset limited real estate partnership formed under Massachusetts partnership law. It has three partners. Carabetta Enterprises, Inc. ("CEI") and Joseph Carabetta are its general partners. They own 97.5% and 2%, respectively, of the partnership. At the time WELP was formed, Joseph Carabetta was CEI's sole shareholder.[1] The third partner, Ralph Carabetta, is a limited partner who owns .5% of the partnership.

The Water's Edge Complex, located in Revere, Massachusetts, consists of six apartment buildings. WELP owns buildings one, two, and five (the "Property"). Buildings three and four were sold off as individually owned condominiums. Building six was originally owned by CEI, but in 1997, it was acquired by First Tower Funding, LLC ("First Tower"). First Tower's sole shareholder is Parham Pouladdej, the plan sponsor. The entire complex is managed by the Carabetta Management Company ("CMC"). Joseph Carabetta is CMC's sole shareholder. His daughter Evelyn works for CMC as the complex's on-site property manager. She is also Pouladdej's wife.

In 1996, Beal purchased a package of loans from the Department of Housing and Urban Development that included $29,480,495.30 in loans to WELP. Those loans are secured by first and second mortgages against the property as well as the rental income generated by the property (the "rents").

### B. *Erosion of the Water's Edge*

The complex was built in the late 1980s. Shortly after construction was completed, the real estate market collapsed and the partnership began to struggle. The property has never generated enough rental income to service its heavy debt. On several occasions, WELP tried to restructure its debt with Beal, but the parties never reached an agreement.

In July 1997, Pouladdej, having already acquired building six, met with Beal representatives to purchase the Water's Edge notes. He was represented by Brown, Rudnick, Freed & Gesmer ("BRF & G") at this meeting. Again, the parties could not reach an agreement. The next month, WELP stopped making payments on the loans, and began to use its operating income to build a retainer with BRF & G for use in the imminent bankruptcy proceedings. In the months preceding bankruptcy, WELP transferred $510,000 to BRF & G.

On March 3, 1998, WELP filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 *et seq.* The next month it filed a motion seeking permission to use its net rents (rental income less operating expenses) to make payments against Beal's principal. Beal opposed the motion. Without a hearing, the court allowed the motion (the "Rents Order").

WELP filed its reorganization plan on March 23, 1998.[2] The plan provided that it would be funded by an equity investment from Pouladdej, the plan's sponsor. He would become WELP's sole general partner in exchange for a $1 million investment, and would have the right to designate additional general and limited partners of the reorganized debtor.[3] The plan

---

1. Joseph Carabetta's interest in CEI was extinguished in a separate bankruptcy action.

2. The plan was amended on May 4, 1998. The amended plan was modified on June 24, 1998 and again on June 29, 1998.

3. The plan actually calls for an investment between $250,000 and $1 million. However, Pouladdej testified at the confirmation hearing that he would make the full $1 million contribution.

also contained a provision providing that none of the partners of the reorganized debtor would be the debtor, or its existing partners or affiliates.

The plan proposed to split Beal's debt into a secured claim and an unsecured claim. The secured claim, representing the value of Beal's security as determined by a bankruptcy judge pursuant to 11 U.S.C. § 506(a), would be paid in full over ten years.[4] The unsecured claim consisted of Beal's deficiency claim (the balance of the loan minus the present value of the secured claim). The plan provides for cash payments equal to .1% of the unsecured claim on the day the plan becomes effective, and a 1% interest in the entity formed by the plan sponsor.

Several creditor classes supported the plan, but Beal and another creditor, CEI,[5] objected. This objection by an impaired class of creditors blocked confirmation of the plan on a consensual basis. *See* 11 U.S.C. § 1129(a)(8).

### C. *The Confirmation Hearing*

On June 29, 1998, Judge Queenan, of the United States Bankruptcy Court, began a three-day evidentiary hearing to determine whether the plan should be confirmed on a cramdown basis. At the close of the hearing, on July 2, 1998, he made oral findings of fact and law. Judge Queenan found that the plan contemplated a sale of equity, and not the sale of an asset. Therefore, Beal did not have the right to "credit bid" against Pouladdej for control of the property. He also valued Beal's secured claim at $16.6 million. The judge arrived at that figure by determining that the property's market value was $17 million and then deducting $400,000 for superior municipal liens and post-petition payments

to Beal. This left Beal with a deficiency claim for approximately $12.9 million, which the plan proposed to pay .1%, roughly $12,900.

Based on those figures, the court projected that WELP's debt obligations would exceed its estimated revenues by $328,000 over the first two years. Through WELP's counsel, Pouladdej offered to increase his investment to $1,328,000 to cover the deficit. On the basis of that offer, the court confirmed the plan (the "Confirmation Order"). This appeal followed.

### D. *The Appeals*

Beal filed four separate appeals in connection with WELP's reorganization, challenging: 1) the Confirmation Order; 2) the Rents Order; 3) the denial of Beal's motion to disqualify BRF & G; and 4) the authorization of BRF & G's fees and expenses. These appeals have been consolidated.

### III. *DISCUSSION*

There are three standards of review in appeals of bankruptcy court decisions. Findings of fact are reviewed under the clearly erroneous standard. *See* Fed. Bankr.R. 8013; *In re G.S.F. Corp.*, 938 F.2d 1467, 1474 (1st Cir.1991). A finding of fact is clearly erroneous when, after reviewing the evidence, the court " 'is left with the definite and firm conviction that a mistake has been committed.' " *Id.* (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). Conclusions of law are reviewed de novo. *See id.* Discretionary matters are reviewed for abuse. *See Patriot Portfolio, LLC v. Weinstein (In re Weinstein)*, 164 F.3d 677, 687 (1st Cir.

---

**4.** The claim is to be payable in any one or more of the following methods, as WELP elects: 1) cash payments before the effective date; 2) surrender of a portion of the collateral; 3) proceeds of the sale of any portion of the collateral; 4) the indubitable equivalent of Beal's claim; and 5) deferred cash payments plus interest as determined by the Bankruptcy Court amortized over forty years, payable in

39 quarterly installments plus a final quarterly payment equal to the remaining unpaid principal and interest. (Appellant Exh. 17:003408.)

**5.** CEI's creditors represented the company's interests in this case.

1999), *cert. denied,* —— U.S. ——, 119 S.Ct. 2394, 144 L.Ed.2d 794 (1999).

## A. *The Confirmation Appeal*

Beal raises multiple challenges to the confirmation of the reorganization plan under sections 1129(a) and (b) of the Bankruptcy Code. The main thrust of its multipronged attack is that the plan is an insider driven scheme that is a "perversion of the process contemplated by Congress in enacting the Chapter 11 cramdown provisions." (Appellant Br. at 17.) An understanding of the cramdown provision in § 1129(b)(1) of the Bankruptcy Code is necessary to evaluate Beal's claims.

### 1. *Cramdown Analysis*

■ Section 1129 of the Bankruptcy Code governs the confirmation of Chapter 11 reorganization plans. 11 U.S.C. § 1129. A plan must be confirmed if it meets the thirteen general requirements listed in § 1129(a). One of those requirements is that each class of impaired creditors must vote to accept the plan.[6] *See id.* §§ 1129(a)(8), 1126(c). Two classes of impaired creditors, Beal and CEI, rejected this plan. But, their rejection is not necessarily fatal, if the Plan meets two conditions for the "cramdown" in § 1129(b)(1).[7] First, the plan must comply with all other general requirements of § 1129(a) and be accepted by at least one impaired class. *See id.* § 1129(a)(10). Second, the objection of an impaired creditor class may be overridden if "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or

interests that is impaired under, and has not accepted, the plan." *Id.* § 1129(b)(1).

■ As to a dissenting class of impaired unsecured creditors, a plan may be found to be "fair and equitable" only if the allowed value of the claim is to be paid in full, *id.* § 1129(b)(2)(i), or in the alternative, if the claim is not paid in full, no junior class may receive any interest in the property, *id.* § 1129(b)(2)(B)(ii).[8] That latter condition is the core of what is known as the "absolute priority rule." *See generally Bank of Am. Nat'l Trust & Sav. Assoc. v. 203 N. LaSalle St. Partnership,* 526 U.S. 434, 442, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999) (*"LaSalle "*).

■ The so-called "new value corollary" to the "absolute priority rule" provides that the "objection of an impaired senior class does not bar junior claim holders from receiving or retaining property interests in the debtor reorganization, if they contribute new capital in money or money's worth, reasonably equivalent to the property's value, and necessary for successful reorganization of the restructured enterprise." *Id.* at 442, 119 S.Ct. 1411.

The typical scenario in which new value plans have been proposed arise in the single asset real estate context. *Id.* at 443 n. 15, 119 S.Ct. 1411 (citing 7 Collier on Bankruptcy ¶ 1129.04[4][c][ii][B], at 1129–113 (15th ed. rev.1998)); *see e.g., In re Coltex Loop Central Three Partners, L.P.,* 138 F.3d 39, 43–45 (2d Cir.1998) (holding a plan may not be confirmed "if old equity's new interest under the plan results in any significant way from its old status"); *In re*

---

**6.** A class of creditors is impaired unless the plan "leaves unaltered the legal, equitable, and contractual rights" of each class member. 11 U.S.C. § 1124(1).

**7.** Section 1129(b)(1) provides:
Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such

paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

**8.** This provision reads: "[T]he holder of any claim or interest that is junior to the claims of such [impaired unsecured] class [may] not receive or retain under the plan on account of such junior claim or interest any property." 11 U.S.C. § 1129(b)(2)(B)(ii).

*Bonner Mall Partnership,* 2 F.3d 899, 910–16 (9th Cir.1993) (relying on the new value corollary to confirm a plan), *vacatur denied and appeal dism'd as moot,* 513 U.S. 18, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994); *In re Bryson Properties, XVIII,* 961 F.2d 496, 504 (4th Cir.1992).

In *LaSalle,* the Supreme Court declined to decide whether the statute includes a new value corollary, but after reviewing the legislative history and statutory scheme, it held:

> The upshot is that this history does nothing to disparage the possibility apparent in the statutory text, that the absolute priority rule now on the books as subsection (b)(2)(B)(ii) may carry a new value corollary. Although there is no literal reference to "new value" in the phrase "on account of such junior claim," the phrase could arguably carry such an implication in modifying the prohibition against receipt by junior claimants of any interest under a plan while a senior class of unconsenting creditors goes less than fully paid.

526 U.S. at 449, 119 S.Ct. 1411. The Court articulated the main concerns about the new value corollary when it added:

> Whether a market test would require an opportunity to offer competing plans or would be satisfied by a right to bid for the same interest sought by old equity, is a question we do not decide here. It is enough to say, assuming a new value corollary, that plans providing junior interests holders with exclusive opportunities free from competition and without benefit of market valuation fall within the prohibition of § 1129(b)(2)(B)(ii).

*Id.* at 458, 119 S.Ct. 1411.

**2. *Credit Bid***

Beal argues that an insider sale of a one hundred percent ownership interest in the reorganized debtor (which is a single-asset entity with no on-going business or employees) where the transaction is not subject to market competition or valuation, is tantamount to a sale or transfer of control of the real property. Therefore, it argues, sections 1129(b)(2)(A)(ii) and 363(k) of the Bankruptcy Code mandate that the plan afford Beal the right to credit bid against its secured claim in order for the plan to be deemed fair and equitable under section 1129(b)(2)(A). WELP responds that the Bankruptcy Code allows a debtor to transfer equity in the bankrupt estate for cash. *See* 11 U.S.C. § 1123(a)(5)(J).

The credit bid provision specifies that a plan is fair and equitable as to a secured creditor if the plan provides:

> for the sale, subject to Section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph.

11 U.S.C. § 1129(b)(2)(A)(ii). Thus, it applies only to the "property that is subject to the liens securing [the secured creditor's] claims." *Id.* The sale of any such collateral must be subject to section 363(k) which provides:

> Unless the court for cause orders otherwise, the holder of [the secured] claim may bid at such sale, and if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

This credit bid provision "gives the secured creditor protections against attempts to sell the collateral too cheaply; if the secured party thinks the collateral is worth more than the debtor is selling it for, it may effectively bid its debt and take title to the property." 7 Collier on Bankruptcy ¶ 1129.05[2][b], at 1129–34 (15th ed. rev.1998).

The fatal flaw in Beal's argument is that the reorganization plan provides for a sale of equity in the limited partnership, not a sale of the collateral. The bankruptcy court found that the transaction was not a sale of property subject to Beal's lien,

and did not improperly frustrate Beal's credit bid rights. *See Institut Pasteur v. Cambridge Biotech Corp.,* 104 F.3d 489, 493 (1st Cir.1997) (stating that the sale of 100% of the debtor's stock pursuant to chapter 11 plan did not constitute a de facto assignment of the debtor's licenses to the new parent corporation), *overruled on other grounds by Hardemon v. City of Boston,* No. 97–2010, 1998 WL 148382 (1st Cir. Apr. 6, 1998). The court did not err when it held that selling all the equity in a limited partnership does not alter the partnership's identity. *Id.* Therefore, the credit bid provision does not apply.

Beal tries to avoid the straightforward strictures of the credit bid provision by arguing that the plan permits insiders to invest new equity in violation of the absolute priority rule. However, its reliance on *Coltex Loop Cent. Three Partners v. BT/SAP Pool C Assocs. (In re Coltex Loop Cent. Three Partners),* 138 F.3d 39 (2d Cir.1998), *In re Dwellco I Ltd. Partnership,* 219 B.R. 5 (Bankr.D.Conn.1998), and *In re Bjolmes Realty Trust,* 134 B.R. 1000 (Bankr.D.Mass.1991) is misplaced because those cases addressed new value investments made by the *original* partners ("old equity") to retain their prior equity interests on account of their prior position. The WELP plan proposes an investment by a *third party.*

■ Nonetheless, Beal urges the Court to extend the absolute priority rule to insiders, like this plan sponsor, who is an insider by virtue of his familial relationship to the debtor, *see* 11 U.S.C. § 101(31)(A)(i). Two courts have held that the Bankruptcy Code does not bar the sale of equity to an insider. *See Penn Mut. Life Ins. Co. v. Woodscape Ltd. Partnership (In re Woodscape Ltd. Partnership),* 134 B.R. 165, 174 (Bankr.D.Md.1991) ("There is no prohibition against a private sale or against a sale to insiders; and there is no requirement that the sale be by public auction."); *cf. Troy Savings Bank v. Travelers Motor Inn, Inc.,* 215 B.R. 485, 494–95 (N.D.N.Y. 1997) (affirming the confirmation of an eq-

uity sale to a debtor's friend and noting that creditors protection in such a sale comes under §§ 1129(a), (b)(2)(A)). While old equity could certainly not use an insider as a straw to retain its investment, there is no finding by the bankruptcy court that Pouladdej was funded by, or acted on behalf of, Joseph or Ralph Carabetta.

■ To be sure, insider private transactions, which are not at arms length, raise the very real spectre that insiders might receive favorable terms at the expense of impaired creditors. Because of the lack of market valuation or competitive bidding, such insider transactions require greater scrutiny by the bankruptcy court to ensure fairness. In *Bjolmes,* in order to measure the proposed contribution against actual market value, the bankruptcy court (Queenan, J.) required that an auction be held among the shareholders and creditors who were interested in purchasing the new shares (100% equity interest in the debtor) as a condition to plan confirmation. 134 B.R. at 1010. While an auction of the equity interest in WELP would have been preferable here, that issue was not pressed below. The bottom line is that neither the credit bid provision nor the new value corollary as described by *LaSalle* applies here. The Bankruptcy Code does not prohibit such sales, and instead relies on the confirmation requirements as the safety net. *See* 11 U.S.C. § 1129(b)(1) (requiring the plan treat non-accepting impaired claims fairly and equitably).

■ Beal makes a last-ditch argument that the withdrawal of WELP's general partners dissolves the partnership, requiring its assets to be sold in order to wind up the partnership. However, WELP correctly counters that the partnership survives this reorganization because its equity changes hands simultaneously on the plan's effective date. Therefore, the partnership is never left without a general partner. *See* Mass.Gen.L. ch. 109,

§ 44(4);[9] *In re Sovereign Group*, 88 B.R. 325, 331 (Bankr.D.Colo.1988) (applying an analogous Colorado partnership statute in similar circumstances).

### 3. *Beal's Secured Claim*

The Bankruptcy Code requires that the plan be fair and equitable with respect to nonaccepting classes of secured claims. With respect to Beal's Class Two secured claim, the fair and equitable requirement is satisfied if the plan provides:

(i) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(ii) that each holder of a claim of such class receives on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property; . . . .

11 U.S.C. § 1129(b)(2)(A).

The plan proposes to pay Beal's secured claim with deferred payments. The terms of those payments are as follows:

Said deferred Cash payments to Beal shall be made pursuant to a new promissory note and amended mortgage in forty (40) quarterly payments as follows: (i) thirty-nine (39) equal quarterly installments of principal and interest accrued (the amount of said payments shall be determined based upon a thirty year, straight line amortization) from and after the Effective Date and continuing on a quarterly basis thereafter, and (ii) a final quarterly payment equal to the remaining unpaid principal and accrued interest.

(Appellant Exh. 17:003401.) These payments are scheduled to begin three months after the effective date. The plan becomes effective sixty days after the final confirmation order is entered, which will happen as soon as all appeals are exhausted or once the time required to file an appeal has run. (*Id.* at 17:003402–03.)

At the confirmation hearing, Beal objected to the plan, claiming that it does not treat Beal's Class Two secured claim fairly and equitably. The court confirmed the plan in spite of that objection. Beal now appeals, raising the following arguments.

### a. *The Note's Present Value*

The Bankruptcy Code mandates that notes guaranteeing secured claims must have a present value at least as great as the claim's value on the plan's effective date. *See* 11 U.S.C. § 1129(b)(2)(A)(i). The plan of reorganization does not become effective until after the confirmation order becomes final and all appeals are exhausted. Beal contends that it was impossible for the bankruptcy judge to properly assess the note's present value because the exact date the plan will become effective is unknown. WELP maintains that Beal waived this issue by failing to raise it in the confirmation objection, during the confirmation hearing, or in its designation.

▮ Issues not raised in previous proceedings can not be raised for the first time on appeal. *See In re Weinstein*, 164 F.3d at 685; *Noonan v. Rauh (In re Rauh)*, 119 F.3d 46, 51 (1st Cir.1997).

---

9. Mass.Gen.L. ch. 109, § 44(4) provides that a limited partnership is dissolved by:

[A]n event of withdrawal of a general partner unless at the time there is at least one other general partner and the written provisions of the partnership agreement permit the business of the limited partnership to be carried on by the remaining general partner and that partner does so, but the limited partnership is not dissolved and is not required to close its affairs by reason of any event of withdrawal, if, within ninety days after the withdrawal, all partners agree in writing to continue the business of the limited partnership and to the appointment of one or more additional general partners if necessary or desired.

Beal was aware of the plan's effective date as soon as the plan was filed on March 23, 1998, but Beal did not challenge the definition during the lengthy confirmation proceedings or in its closing argument. The primary argument Beal presented regarding its secured claim was that the claim's proposed value and interest rate were too low.

 Beal now attempts to evade the waiver rule by claiming that the effective date argument is a subset of its general objection that the plan is not fair and equitable. This is unconvincing. An argument is not preserved for appeal simply by virtue of the fact that "the raw facts ... determinative of [the] theory [were] before the bankruptcy court." *In re Rauh*, 119 F.3d at 51. Nor is it preserved "merely by ... generalized argumentation." *Id.*; *see also Paterson–Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990 (1st Cir.1988) (finding waiver because a party failed "to spell out its arguments squarely and distinctly" at a magistrate's hearing). By failing to squarely raise the effective date argument at the confirmation hearing, Beal waived the right to raise it on appeal. *See In re LaRoche*, 969 F.2d 1299, 1305 (1st Cir. 1992); *Fish Mkt. Nominee Corp.*, 72 F.3d at 6.

### b. *Pre–Effective Date Cash Payments*

 Beal next argues that the court impermissibly disregarded pre-effective date cash payments when performing the fair and equitable analysis required by § 1129(b)(2)(A). Primarily, it complains that the court failed to fix an appropriate interest rate for pre-effective date deferred cash payments. WELP contends that this issue was not properly raised below as is therefore waived. Again, Beal argues that its generic challenge that the plan is not fair and equitable to its secured claim is sufficient to preserve the issue for appeal. I agree with appellee that this issue was not fairly presented to the bankruptcy court except to the extent raised in the section discussing "rents."

### c. *The Secured Claim's Value*

Beal challenges the bankruptcy court's finding that its secured claim is worth $16.6 million. The court arrived at this figure by first determining that the property's market value is $17 million. From that figure, the court subtracted $400,000 which represents superior municipal liens ($140,000) and post-petition payments made to Beal ($260,000).

 The face value of WELP's debt to Beal is in excess of $29 million. The security for that debt is the property and its rental income. In bankruptcy, a creditor's secured claim is worth only as much as its security. *See* 11 U.S.C. § 506(a) ("An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim...."); *In re Crummie*, 194 B.R. 230, 238 (Bankr.N.D.Cal.1996). "The phrase 'value of such creditor's interest' in § 506(a) means 'the value of the collateral.'" *United Sav. Assn. of Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 372, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (citing legislative history) ("*Timbers*"). If a creditor is undersecured (the security is worth less than the debt), the creditor holds an unsecured claim equal to the deficiency. *See id.* There is no dispute that Beal is an undersecured creditor. The value of Beal's security is particularly important in this case because the plan proposes to pay Beal, over time, the present value of its secured claim, but only .1% of its unsecured claim.

### i. *The Property's Value*

 Beal first challenges the bankruptcy court's finding that the fair market

value of the property is $17 million. Since this issue involves a finding of fact, it is reviewed for clear error. *See* Fed. Bankr.R. 8013; *In re G.S.F. Corp.*, 938 F.2d at 1474. Beal argues that the court erred in determining the property's value by relying on an appraisal that assumed too high a capitalization rate (the rate of return for the plan sponsor) and double-counted improvement costs (property up-grades necessary to enable the property to service its restructured debt).

■■■ At the confirmation hearing, both parties introduced expert property appraisals into evidence. Beal's expert, Don Bouchard, appraised the property at $21 million. WELP's expert, Richard Bonz, appraised the property at $14.9 million. Both experts used the same method to appraise the property, but they arrived at different conclusions because they based their conclusions on different assumptions.[10] Their key differences involved the assumed capitalization rates and improvement costs. Bonz (for WELP) assumed a 9.5% capitalization rate and approximately $1.3 million for improvements.[11] (Appellant Exh. 13:002568–69.) Bouchard (for Beal) assumed a 9.00% capitalization rate and $300,000 for improvements. (Appellant Exh. 6:001074.74, 001074.70.)

Beal's claim that Bonz used too high a capitalization rate and double-counted some improvements is confusing in light of the fact that Judge Queenan ruled substantially in Beal's favor on this issue. In support of his property value finding, the judge stated, "I accept much of what Mr. Bonz said except that I lower his cap rate and I ignore much of the [improvement] expenditures proposed...." (Appellant Exh. 16:003380.) Considering the court's ruling, Beal's argument is reduced to a claim that the court's finding is clearly erroneous because the judge did not adopt Bouchard's appraisal whole-hog.

After hearing both experts first hand, Judge Queenan assessed their credibility and determined that on balance Bonz's appraisal was more accurate than Bouchard's. He adjusted Bonz's appraisal after careful consideration of its weak points. This Court will not disturb Judge Queenan's credibility determinations, or his fact-findings based on issues such as this, where one is not left with the "definite and firm conviction that a mistake has been committed." *In re G.S.F. Corp.*, 938 F.2d at 1474.

Beal also challenges the judge's hearsay exclusion of two letters from institutional investors that expressed a preliminary interest in purchasing the property for more than $20 million. These were offered on the last day of trial. Beal argues that the letters were admissible to rebut Bonz's testimony that the property is not investment grade. On cross-examination, Bonz qualified that testimony, stating that his opinion would be different if an institutional investor, after completing due diligence, was willing to purchase the property for more than $20 million. (Appellant Exh. 16:003190.)

■■■ The bankruptcy judge did not err in excluding the letters as hearsay.

---

**10.** Bonz (for WELP) assumed a: stabilized vacancy of 7.5%; stabilized gross income of $3.77 million; stabilized expenses—$2.186 million; replacement reserves of $658/unit; stabilized net income of $1.585 million; and a capitalization rate of 9.5%. These assumptions resulted in a $16.26 million value. Bonz then deducted $1.36 million for capital improvements, and concluded that the property was worth $14.9 million. (Appellant Exh. 130.)

Bouchard (for Beal) assumed a: stabilized vacancy of 5%; stabilized gross income of $3.9 million; stabilized expenses of $1.7 million; replacement reserves of $200/unit; and a capitalization rate of 9%. Capitalizing the stabilized net income yielded a $21.6 million value. Bouchard deducted $260,000 to account for vacancies and $300,000 for improvements, leaving a value of $21,040,000, which he rounded down to $21 million. (Appellant Exh. 69.)

**11.** These improvements include $280,00 to upgrade the property to the point where it can realize stabilized income and $1,080,000 for capital improvements. (Appellant Exh. 130 at 85.)

Experts are allowed to base their opinions on information which would otherwise be inadmissible hearsay. *See* Fed.R.Evid. 703. For that reason, Bouchard properly used the information provided by the institutional investors telephonically as a basis for his expert opinion that the property was institutional grade, and that he "tested that theory in the market". (Appellant Exh. 16:003226–27.) However, Beal admitted that its appraisers did not rely on the letters in formulating their appraisals. There is no free-standing "rebuttal evidence" exception to the hearsay rule. The court properly excluded the letters.

### ii. The Rents: To Add or Subtract?— That is the question.

Beal also argues that the bankruptcy court undervalued its secured claim by failing to take the accumulated cash collateral into account in placing a value on its secured claim. The WELP loan was secured by mortgages on the property and assignments of the rental income generated by the property. Prior to the confirmation hearing, the court ruled that because Beal was an undersecured creditor, its post-petition net rents were not additional collateral to be added to Beal's secured claim. The court then authorized WELP to use the post-petition net rents to make payments against the *principal* of its debt to Beal.[12] Later, the court determined the value of Beal's secured claim by *subtracting* those payments from the property's market value. Beal maintains that it was error not to *add* the payments and any net rents not paid to Beal to the property's

value to determine the value of the secured claim.

At the confirmation hearing, Beal vigorously challenged the plan's treatment of its secured claim, primarily on the grounds that WELP's proposal undervalued the property and proposed too low an interest rate. However, Beal also argued that its secured claim must consist of the property's market value and the accumulated net rents. Unlike some of the other issues which Beal never mentioned in the confirmation hearing, Beal did discuss the $260,-000 in post-petition payments in its closing argument. It acknowledged that WELP sent Beal $260,000 with a cover letter asking Beal to apply the money to the WELP's debt. Counsel explained, "[W]e respectfully declined to do [that] pending further instruction from the Court. So we're holding that's part of our collateral in addition to the real estate." (Appellant Exh. 16:003349.) They also discussed the appeal of the interim order, and explained why the $260,000 in interim payments plus $100,000 a month shouldn't be credited against the claim. (*Id.* 16:003345.) This objection is enough to preserve the issue.

The dispute here centers on the bankruptcy court's decision to subtract the amount of the post-petition net rents from the value of the secured claim, rather than add it. Whether to add or subtract the post-petition net rent payments in a bankruptcy proceeding involving an undersecured creditor is a question that has split bankruptcy courts.[13] *See In re Union*

12. Beal appealed that April 21, 1998 order to this Court, arguing that the bankruptcy court erred by: granting the motion without a hearing; failing to develop an evidentiary record or making findings to support the order; and granting the order prior to a confirmation hearing. In its appeal, Beal argued that the only way a creditor's prepetition secured claim may be modified is through a formally approved plan of reorganization. In a hearing before this Court, Beal conceded that these arguments of a procedural nature were mooted by the confirmation hearing. *See* Hr'g 4/20/99 R. at 59.

13. There is also considerable disagreement concerning the appropriate time to value a creditor's security. *See, e.g., In re Addison Properties Ltd. Partnership,* 185 B.R. 766, 783–86 (Bankr.N.D.Ill.1995) (valuing a claim as of the filing date and then revaluing it at confirmation and adjusting it as necessary); *In re Reddington/Sunarrow Ltd. Partnership,* 119 B.R. 809, 813 (Bankr.D.N.M.1990) (valuing the claim as of the date the bankruptcy petition was filed); *In re Flagler–At–First Assocs., Ltd.,* 114 B.R. 297, 304 (Bankr.S.D.Fla.1990) (valuing the claim continuously); *see also* Sally S. Neely et al., *Postpetition Rents and the*

*Meeting Partners,* 178 B.R. 664, 674–76 (Bankr.E.D.Pa.1995) (comparing conflicting case law).

■ The debate begins with an understanding of the interplay between Sections 506 and 552(b) of the Bankruptcy Code. Section 506 defines the amount of the secured creditor's allowed secured claim and the conditions of his receiving post-petition interest. It provides in relevant part:

(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim....

(b) To the extent that an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

Section 506 denies undersecured creditors post-petition interest on their claims. *See Timbers,* 484 U.S. at 372, 108 S.Ct. 626. The court reasoned:

If ... [the creditor's right to immediate possession of its collateral] were included, 'the value of such creditor's interest would increase, and the proportions of the claim that are secured and unsecured would alter, as the stay continues—since the value of the entitlement to use the collateral from the date of bankruptcy would rise with the passage of time.' No one suggests this was intended. The phrase "value of such cred-

itor's interest" in § 506(a) means "the value of the collateral."

*Id.* One rationale for the *Timbers* holding is particularly helpful here: "It was considered unfair to allow an undersecured creditor to recover interest from the estate's *unencumbered assets* before unsecured creditors had recovered any principal." *Id.* at 373, 108 S.Ct. 626 (emphasis added).

In *Timbers,* the Supreme Court distinguished the undersecured creditor seeking "use value" under § 362 from an undersecured creditor with a "perfected security interest in post-petition rents." *Id.* at 374, 108 S.Ct. 626. Section 552(b) of the Code makes possession of a perfected security interest in post-petition rents or profits from collateral a condition of having them applied to satisfying the claim of the secured creditor ahead of the claims of unsecured creditors. *Id.*

The Maginot line is clearly drawn. The "subtraction" cases hold that post-petition rent payments to the undersecured creditor should be subtracted from the secured portion of the creditor's claim as measured by the value of the real estate. *See, e.g., Confederation Life Ins. Co. v. Beau Rivage Ltd.,* 126 B.R. 632, 640 (N.D.Ga.1991); *In re Mullen,* 172 B.R. 473, 478–79 (Bankr. D.Mass.1994); *In re Kalian,* 169 B.R. 503, 505 (Bankr.D.R.I.1994); *In re Reddington/Sunarrow Ltd. Partnership,* 119 B.R. 809, 813 (Bankr.D.N.M.1990). Conversely, the "addition" cases hold that the amount of post-petition rents not reinvested into real estate should be added to the size of the creditor's secured claim, and that payment of those rents decreases the total amount of the creditor's claim but not the secured portion of its claim as measured by the value of its real estate. *See, e.g., In re Union Meeting Partners,* 178 B.R. at 675–77; *In re Columbia Office Assocs., Ltd.,* 175 B.R. 199, 202–03 (Bankr.D.Md.

*Claims of Undersecured Creditors With Assignment of Rents in Chapter 11 Cases,* SD24 ALI–ABA 363, 373–91 (1998) (offering an in-depth treatment of the relative advantages and disadvantages of each method) (date?). The

Court will not join in the debate on this complex issue because neither party pressed it before the bankruptcy court or on appeal. This may be an issue the parties wish to address on remand.

1994); *In re Bloomingdale Partners*, 160 B.R. 93, 99 (Bankr.N.D.Ill.1993); *In re Flagler–At–First Assocs., Ltd.*, 114 B.R. 297, 301 (Bankr.S.D.Fla.1990).

■■■ Although the question is close, the Court concludes that Beal's prepetition security interest in rents should be added to the value of its secured claim. *See* Sally S. Neely et al., *Postpetition Rents and the Claims of Undersecured Creditors With Assignment of Rents in Chapter 11 Cases*, SD24 ALI–ABA 363, 381 (1998) (surveying post-petition rent cases and deeming the "addition" cases the "majority approach"). This position is rooted in the plain language of § 552(b)(2), which extends prepetition security interests in rents to those acquired "by the estate *after* the commencement of the case." 11 U.S.C. § 552(b)(2) (emphasis added).[14] While Section 552(b) does permit the growth of an undersecured creditor's secured claim post-petition, this does not rattle *Timbers* which does not prevent a secured claim from growing post-petition due to the operation of Section 552(b) or, for that matter, due to appreciation. *See In re Union Meeting Partners*, 178 B.R. at 675; Chaim J. Fortgang et al., *Recent Developments in Post–Petition Interest*, SB37 ALI–ABA 255, 288 (1997) (stating that the *Timbers* Court "never even considered whether section 552(b) proceeds increase the secured claim of an undersecured creditor").

The "addition" approach is consistent with the Supreme Court's holding that any appreciation in the value of collateral should be used "to the benefit of the creditor, not to the benefit of the debtor and not to the benefit of other unsecured creditors." *Dewsnup v. Timm*, 502 U.S. 410,

417, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992); *see* 4 Collier on Bankruptcy ¶ 506.01[7][f], at 506–90 ("[T]he courts have virtually uniformly recognized that the value of property securing a claim, and thus the allowed amount of the secured claim, may change during the course of the bankruptcy case."); Fortgang et al., *supra*, SB37 ALI–ABA at 279 ("[A] secured creditor should benefit from post-petition increases in the value of the property securing the creditor's claim [because] the essence of the bargain between a prospective secured lender and a borrower is the value of the collateral (and potential appreciation thereof) securing the claim.").

In cases involving undersecured creditors, I am persuaded that the better approach is that collateral consists of the sum of the creditor's separate security interests in the buildings *and* the accumulated post-petition rents. *See In re Union Meeting Partners*, 178 B.R. at 676 ("[W]e consider the rent payments to be nothing more than advance payments on account of the creditor's secured claim resulting from a 'liquidation' of part of that creditor's collateral, i.e., the rents themselves.").

For the foregoing reasons, the Court reverses the bankruptcy court and re-values Beal's secured claim at $17,120,000.[15]

### iii. *The Interest Rate*

■■■ Beal next appeals Judge Queenan's determination that the appropriate interest rate for the deferred payments is 9%. Interest rate calculations are findings of fact, and are reviewed for clear error. *See Financial Sec. Assurance, Inc. v. T–H New Orleans Ltd. Partnership (In re T–H New Orleans Ltd. Partnership)*,

---

**14.** The provision states in full:

> [I]f the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to amounts paid as rents of such property or the fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties, then such security interest extends to

such fees, charges, accounts, or other payments *acquired by the estate after the commencement of the case* to the extent provided in such security agreement. . . .

11 U.S.C. § 552(b)(2) (emphasis added).

**15.** This number is derived by adding the accumulated net rents ($260,000) to the property value ($17 million) and subtracting municipal liens ($140,000).

116 F.3d 790, 800 (5th Cir.1997). Beal argues that: 1) the court's rate inadequately reflects the note's risk; 2) the judge erred by not offering reasons to support the finding; and 3) the judge failed to consider the debtor's financial problems, the age of the property, and its marketability. None of these arguments is compelling enough to overcome the clearly erroneous hurdle.

Many courts treat deferred payments of an obligation under a bankruptcy plan as a "coerced" loan and look to the market to determine the appropriate rate for a loan of that size, duration, and risk. *See In re Busconi,* 147 B.R. 54, 55 (Bankr.D.Mass. 1992) ("Every circuit court of appeals addressing this issue has held the market rate of interest to be appropriate for payment streams in a cramdown."); 7 Collier on Bankruptcy (15th ed. rev.1998) ¶ 1129.06[1][c][ii], at 1129–148. Each party introduced expert evidence relating to the appropriate interest rate for this type of loan. WELP's expert, Randall Harwood, surveyed several lenders and opined that 7.5% is the appropriate rate. (Appellant Exh. 15:002922.) Beal's expert, Joel Shapiro, conducted a similar survey, but concluded that the rate should be 10%. (*Id.* at 15:003253.) The court weighed the experts' testimony and split the baby, finding the appropriate rate to be 9%. The judge stated that he did not want to go "into detail" on why he chose that rate, but he explained that WELP's rate was too low. (*Id.* at 15:003382.)

Beal's claim that the chosen rate inadequately reflects the project's risk is unpersuasive. The bankruptcy court listened to three days of competing testimony, much of which included risk assessments. From his position on the front-line, Judge Queenan had the best vantage point from which to assess the credibility of those witnesses. After listening to testimony (which included relevant factors such as the debtor's financial history, the property's age, and its marketability) and weighing witness credibility, the court determined that 9% adequately reflects the project's risk. Judge Queenan explained "[N]ine percent is what seems to make sense. What the debtor offered ... is really too little." (*Id.* 16:003382–83.) Although a more detailed explanation would have been helpful, the court's rate falls safely within the range of expert opinion.

#### 4. *Beal's Unsecured Claim*

Beal next argues that the plan does not treat its unsecured claim fairly and equitably because it does not comply with the absolute priority rule in violation of § 1129(b)(2)(B)(ii) of the Bankruptcy Code.

Beal first claims the plan violates the absolute priority rule because it proposes to make payments to classes seven (CEI) [16] and eight (CMC),[17] which are subordinate to Beal's unsecured claim, without fully paying Beal's claim. Again, the Court can not address this argument because Beal did not raise it at the confirmation hearing. *See In re LaRoche,* 969 F.2d 1299, 1305 (1st Cir.1992); *Fish Mkt. Nominee Corp.* 72 F.3d at 6.

Beal's second claim is that the existing owners impermissibly retained an interest in the reorganized debtor without first paying all creditors in full in violation of the absolute priority rule. Beal argues that the proposed CMC management contract and Pouladdej's equity are a retained interest. The threshold issue in this claim is whether the original partners retain an interest in the reorganized partnership.

---

**16.** Originally, Joseph Carabetta was the sole shareholder of CEI, but he lost his interest in the company in a separate Chapter 11 proceeding. In this proceeding, CEI was controlled by its former creditors. Under the plan, CEI will receive .1% of its claim, or approximately $14,000 on its $14 million claim.

**17.** CMC is also scheduled to receive .1% of its claim, or approximately $366 on its $366,000 claim.

First, the proposed management contract cannot be considered a retained interest because it is no longer part of the confirmed plan.[18] Although Judge Queenan stated that he did not believe the contract was a retained interest, he deleted the provision because he viewed it as an impediment the confirmation process. (Appellant Exh. 16:003379.) Beal's argument that the judge "tacitly approved" the contract and his tacit approval is "tantamount to a retention of property," lacks support in the record.

Second, as addressed before, there is no support in the record for the contention that Pouladdej's equity interest is a retained interest by "old equity".

### 5. *Everything–But–The Kitchen–Sink Attack (§ 1129(a))*

#### a. *Good Faith (§ 1129(a)(3))*

■ Beal argues that the bankruptcy judge erred in finding that the plan was proposed in good faith as required by § 1129(a)(3). This argument is based on the plan's goals, which Beal contends were: 1) to transfer the property to Pouladdej; 2) to pair down the debt through insider mismanagement that resulted in a high vacancy rate; 3) to deny Beal its right to credit bid on the property; and 4) to artificially impair classes to increase the odds that one of those classes would approve the plan. Good faith is a factual finding, and is, therefore, reviewed for clear error. *See In re Bolton Hall Nursing Home*, 432 F.Supp. 528, 532 (D.Mass.1977); *In re Arnold and Baker Farms*, 177 B.R. 648, 658 (9th Cir. BAP 1994).

■ A plan is proposed in good faith if it "bear[s] some relation to the [Bankruptcy Code's] objective of resuscitating a financially troubled corporation." *Connell v. Coastal Cable T.V., Inc. (In re Coastal Cable T.V., Inc.)*, 709 F.2d 762, 765 (1st Cir.1983). A plan is not made in good faith if there is "no realistic possibility of effective reorganization exists and it is evi-

dent that the debtor seeks to delay or frustrate the legitimate efforts of secured creditors to enforce their rights." *In re Sound Radio, Inc.*, 93 B.R. 849, 853 (Bankr.D.N.J.1988). However, the plan need not be one "that the creditors would themselves design." *In re Briscoe Enters., Ltd.*, 994 F.2d 1160, 1167 (5th Cir. 1993). A good faith finding should be based on the totality of the circumstances. *See In re Smithfield Estates, Inc.*, 52 B.R. 220, 222 (Bankr.D.R.I.1985).

Beal relies on Joseph Carabetta's deposition testimony that he instructed his lawyers to transfer control of the property to Pouladdej, but left the plan's structure up to them. (Appellant Exh. 16:003353–56.) Beal also points to WELP's efforts to voluntarily restructure its debt before filing for bankruptcy protection. However, at the confirmation hearing, Joseph Carabetta testified that he solicited Pouladdej to sponsor the plan mainly because he knew that Pouladdej had the money necessary to improve the property to the point where it could service its debt. (Appellant Exh. 15:002960.) Further, because the property had never been able to generate enough income to service its heavy debt, pairing down WELP's debt obligations is critical to a successful reorganization. Although these factors could be construed as evidence of bad faith, they can also be construed as part of a larger legitimate objective to resuscitate a failing business.

■ Beal next charges bad faith alleging that the plan was cleverly and intentionally structured so that Beal would be denied its right to credit bid on the property. The fact that this plan is not one that Beal "would [itself] design" does not mean that it violates "the good faith requirement." *In re Briscoe Enters., Ltd.*, 994 F.2d at 1167. Because the plan has a reasonable chance of successfully resuscitating the partnership and was not designed simply to frustrate creditors, the

---

**18.** For a further discussion of the CMC provi-sion, see *infra* Part III.A.5.b.

bankruptcy court's finding that it was offered in good faith cannot be disturbed.

In sum, there is no substantial evidence in the record that WELP intentionally mismanaged the property in order to suppress the cash flow and to achieve a low valuation. Beal's bad faith arguments fail.

### b. Court Approval of Management Fees (§ 1129(a)(4))

 Beal next argues that the bankruptcy court erred by "tacitly approving" a ten year contract allowing CMC to manage the property. Under § 1129(a)(4), a court must approve as reasonable all payments for services made or to be made under a Chapter 11 reorganization plan.[19]

 Beal claims error because the judge left the door open for WELP to retain CMC after the plan becomes effective. However, that possibility, or even probability, does not offend the Bankruptcy Code. Once the plan becomes effective, WELP's debt obligations are set by the confirmed plan. As long as the reorganized partnership is able to meet those obligations, it is free to employ other organizations as it deems necessary. *See Heartland Fed. Sav. & Loan v. Briscoe Enter. Ltd., II (In re Briscoe Enter. Ltd., II)*, 138 B.R. 795, 809 (N.D.Tex.1992), *rev'd on other grounds*, 994 F.2d 1160 (5th Cir. 1993) (stating that once a plan becomes effective, the reorganized debtor is a new entity and is no longer subject to the bankruptcy court's jurisdiction). Accordingly, WELP is free to retain CMC or any other management company. *See id.* ("[Court] approval of fees for post-confirmation services is not required."); *cf. In re Sherwood Square Assocs.*, 107 B.R. 872, 878 (Bankr.D.Md.1989) ("To the extent these fees are attributable to *pre-Effective Date* services, Court approval is required before

any payment of the fees is made under the Plan.") (emphasis added).

### c. Disclosure of Insiders to be Employed by the Reorganized Debtor (§ 1129(a)(5)(B))

 Beal also argues that the plan violates the Code because it failed to disclose the amount Evelyn Carabetta would be paid for her work as the post-effective date on-site property manager. Section 1129(a)(5)(B) requires the debtor to disclose the names of any insiders it will employ after reorganization and also the nature of their compensation. Evelyn Carabetta is considered an insider because she is the plan sponsor's wife and a general partner's daughter. *See* 11 U.S.C. § 101(31)(C). She is employed by CMC as the on-site property of the complex.

 Beal's claim that the plan should have disclosed her future compensation falls short because Evelyn Carabetta is not employed by the debtor, but by CMC. The plan disclosed that if CMC continued to manage the property it would receive a three percent management fee. Also, WELP's plan fully discloses that Joseph Carabetta is CMC's sole shareholder. That disclosure is enough to comply with section 1129(a)(5).

### d. Best Interest of the Creditors (§ 1129(a)(7))

 Beal next challenges the confirmation finding, arguing that the plan does not serve the best interests of the creditors. Section 1129(a)(7)(A) requires that all impaired creditors who reject the plan must receive at least as much value in reorganization as they would receive in a Chapter 7 liquidation. *See Granada Wines, Inc. v. New England Teamsters and Trucking Indus. Pension Fund*, 748

---

19. The Code provides:
 Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case,

or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.
11 U.S.C. § 1129(a)(4).

690

F.2d 42, 44 (1st Cir.1984). The proponent of the plan bears the burden of proof to show that this requirement is satisfied. *See In re The Landing Assocs. Ltd.,* 157 B.R. 791, 818 (Bankr.W.D.Tex.1993). The bankruptcy court's determination of the creditors' best interests is a finding of fact, and it is reviewed under the clearly erroneous standard. *See Farmers Home Admin. v. Arnold & Baker Farms (In re Arnold & Baker Farms),* 177 B.R. 648, 653 (9th Cir. BAP 1994).

Beal argues that WELP did not satisfy its burden of proof regarding the creditors' best interests. On May 4, 1998, WELP filed an amended disclosure statement, which included a liquidation analysis. The analysis demonstrated that classes six through ten would not receive anything in a Chapter 7 liquidation. (Appellant Exh. 2:000326) That day the court held a hearing on the sufficiency of the statement. It found the liquidation analysis to be lacking and instructed WELP to supplement the statement with information such as potential creditor recoveries from avoidance actions and claims against the general partners, as well as an estimated portion of WELP's $510,000 retainer with BRF & G that would be unspent in the representation. (Appellant Exh. 3:000443–46.)

At the confirmation hearing, nearly two months later, WELP did not produce any of the requested information. In fact, the only time the subject came up was in WELP's closing argument. Counsel made a cursory argument that the plan satisfies the best interests test. But, Beal never pressed WELP on its failure to comply with the judge's instructions or argued that WELP failed to meet its burden of proof on this issue. Not surprisingly, the bankruptcy court did not specifically analyze the creditors' best interests. The court did, however, make a finding that the plan complies with § 1129(a)'s general requirements with the exception of unanimous acceptance. (Appellant Exh. 16:003380.)

Whether WELP satisfied its burden is an issue that need not be decided because Beal failed to challenge WELP's assertion that the best interest test was satisfied and never raised an issue as to WELP's failure to put on evidence of a liquidation analysis. It has, therefore, waived the right to raise the issue on appeal. *See Fish Mkt.,* 72 F.3d at 6; *In re LaRoche,* 969 F.2d at 1305.

### e. *Classification of Claims (§ 1129(a)(10))*

Beal next challenges the plan's confirmation asserting that the plan improperly classified creditor claims. In support of this claim, Beal makes two arguments. First, it contends that the plan "artificially impaired" claims in order to increase the odds that an impaired class would accept the plan. Second, it argues that the plan impermissibly separated Beal's unsecured deficiency claim (Class Nine) from the other unsecured claims (Class Six). Claim classification is a factual issue and is reviewed for clear error. *See In re Memorial Prods. Co.,* 212 B.R. 178, 184 (1st Cir. BAP 1997) (reviewing the debtor's ability to pay impaired claims); *Steelcase, Inc. v. Johnston (In re Johnston),* 21 F.3d 323, 327 (9th Cir. BAP 1994) (reviewing the similarity of claims).

### i. *Artificial Impairment*

Beal argues that the plan artificially impaired Classes One, Three, Five, Six, and Twelve. It contends that WELP could have paid each claim in full on the plan's effective date, but decided not to do so in order to maximize the plan's chances of being accepted. Acceptance by at least one impaired class is required before a plan can be considered under the cramdown provisions. *See* 11 U.S.C. § 1129(a)(10). Congress enacted this provision to require "some indicia of support by affected creditors and to prevent confirmation when that support is lacking." *In re Lettick Typografic, Inc.,* 103 B.R. 32, 38 (Bankr.D.Conn.1989). Acceptance by an

artificially impaired class does not fulfill this requirement. *See Windsor on the River Assocs. v. Balcor Real Estate Fin. Inc. (In re Windsor)*, 7 F.3d 127, 132 (8th Cir.1993). A class is artificially impaired if a debtor intentionally alters the class members' rights in order to manipulate the voting process, but it is legitimately impaired if the creditors' rights are altered for a proper business purpose. *See In re Memorial Prods. Co.*, 212 B.R. at 183.

The parties hotly dispute whether the plan artificially impairs any classes,[20] but the Court need not resolve their dispute in order to assess this issue because it is undisputed that Class Ten, WELP's bondholders, is legitimately impaired and accepted the plan. Their acceptance satisfies § 1129(a)(10).

### ii. *Separate Classification of Beal's Unsecured Claim*

 Beal's next challenge, that the plan violated the Code by classifying Beal's unsecured deficiency claim separately from the other unsecured claims, is also unavailing. Claims may only be grouped together if they are "substantially similar to the other claims or interests in [the] class." 11 U.S.C. § 1122(a). Several courts outside the First Circuit have interpreted this requirement to prohibit separate classification of substantially similar claims absent an appropriate business justification. *See, e.g., Boston Post Road Ltd. Partnership v. FDIC (In re Boston Post Road Limited Partnership)*, 21 F.3d 477, 483–84 (2d Cir.1994) (refusing to confirm a cramdown plan where the only accepting class was "segregated without any demonstrated legitimate reason from like unsecured creditors, who rejected the Plan and whose claims predominated in amount over those [accepting] creditors"); *Travelers Ins. Co. v. Bryson Properties, XVIII (In re Bryson Properties, XVIII)*, 961 F.2d 496, 502 (4th Cir.1992) ("[A]lthough separate classification of similar claims may not

be prohibited, it 'may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims.' ") (quoting *In re Greystone III Joint Venture*, 995 F.2d 1274 (5th Cir.1992)). The standard of review is clearly erroneous. *See In re Johnston*, 21 F.3d 323, 327 (9th Cir.1994).

 Even if the Court were to accept the proposition that similar claims must be classed together, Beal's argument would fall short because Beal's claim is *not* substantially similar to the other unsecured claims. The bankruptcy court ruled that separate classification was appropriate for two reasons. First, Beal's deficiency claim is a non-recourse claim and other unsecured creditors have recourse claims. (Appellant Exh. 16:003375.) Second, Beal has a very different voting motivation than the other unsecured claim holders. Judge Queenan noted:

Beal in voting its unsecured claim has a far different motivation than the other unsecured creditors. I have *never* had any case, and I've had a lot of them, where I concluded that the unsecured deficiency claim was voted in the interest of the unsecured claim. It's *always* voted in the interest of the secured claim. That's not bad faith. By no means is it bad faith because it's being voted in the interest of the claimant, generally as a claimant, but it is a far, far different motivation and not just in degree from the motivation of the other unsecured creditors. So on the principles of basic voting democracy, it doesn't make sense to have a vote—to have a claimant with that different motivation to be in the same class as the other claimants.

(*Id.* 16:003376.) Moreover, there is no evidence that the separate classifications were based on an improper business justification. Because the court's finding that

---

**20.** WELP responds to Beal's argument by asserting that: WELP was not able to pay these claims in full; there was a legitimate business

purpose for impairing them; and that § 1124 does not allow it to "unimpair" these classes.

separate classification is proper is reasonable, it can not be disturbed as clearly erroneous. *See In re Gato Realty Trust Corp.*, 183 B.R. 15, 21–22 (Bankr.D.Mass. 1995) ("On a most basic level, this court cannot avoid the practical realization that the rights afforded to holders of deficiency claims are simply greater (and therefore different) from the rights given to other unsecured creditors. This difference in rights leads inevitably to a difference in interests.").

### f. *Feasibility (§ 1129(a)(11))*

Beal next challenges the plan's feasibility arguing that WELP failed to carry its burden of proving that the plan sponsor is able to make the promised investment that is necessary to allow the reorganized debtor to pay its obligations under the plan. This issue is now moot because on remand the bankruptcy court must reconsider the plan's feasibility in light of the new $17.12 million value of Beal's secured claim.

### 6. *Request for Discovery Sanctions*

Beal's final confirmation challenge is that the bankruptcy court should not have allowed Joseph and Evelyn Carabetta to testify because they failed to cooperate during discovery. Beal argues that it was materially prejudiced by its inability to obtain adequate discovery.

According to Beal, Joseph Carabetta answered some form of "I don't recall" to approximately 110 depositions questions, many of which concerned basic subjects such as his involvement in the property. Similarly, Evelyn Carabetta did not recall the answer to nearly 225 deposition questions. Many of the questions posed to Ms. Carabetta concerned her role as the property manager. Beal sought sanctions for their apparent lack of cooperation and moved to prohibit them from testifying at the confirmation hearing. The court denied that motion. Beal now claims prejudice because both witness' memories "improved" at the confirmation hearing, at which they answered many of the questions they were previously unable to answer.

■■■ The decision whether to award sanctions for a failure to comply with a discovery order is an exercise of discretion. *See* Fed.R.Bankr.P. 7037; *Elder–Beerman Stores Corp. v. Thomasville Furniture Indus., Inc. (In re Elder–Beerman Stores Corp.)*, 206 B.R. 142, 152 (Bankr. W.D.Ohio 1997). Sanction decisions should, therefore, not be disturbed absent an abuse of discretion. *See Rothery v. Marshack (In re Rothery)*, 200 B.R. 644, 649 (9th Cir. BAP 1996).

■ The only specific example that Beal offers in support of its sanction request is Joseph Carabetta's inability to name WELP's general partners in a deposition. At the confirmation hearing, he was able to answer the question, and explained that he had "checked his records" since the deposition. (Appellant Exh. 15:002980–81.) While the inability to answer such a simple question suggests that Joseph Carabetta may have been less than forthcoming, this lone example is not nearly enough to demonstrate prejudice to Beal, or such recalcitrance that Judge Queenan abused his discretion in denying the sanction request.

### B. *The Brown, Rudnick Appeal*

Beal filed two appeals relating to BRF & G's involvement in the case. The first challenges the bankruptcy court's denial of Beal's motion to disqualify BRF & G based on its claim of dual representation of the debtor and plan sponsor. The second challenges the final authorization of BRF & G's fees and expenses.

### 1. *Factual and Procedural Background*

Unless otherwise specified, the following facts are undisputed.

Since 1995, William Baldiga, Esq., of BRF & G, has had an extensive relationship with WELP and its insiders. Baldiga and other BRF & G attorneys have repre-

sented Carabetta family members individually, as well as the business entities they control on a wide range of matters. For example, the firm represented Evelyn Carabetta in a prenuptial agreement and in her efforts to maintain family control over building six in the Water's Edge complex. Baldiga represented Pouladdej in the acquisition of building six in early 1997. Moreover, BRF & G assisted Pouladdej in setting up the management company for building six.

On the basis of this relationship, Joseph Carabetta asked Baldiga to accompany Pouladdej and him to a loan workout meeting with Beal on July 29, 1997 in connection with the acquisition of buildings one, two and five. Pouladdej believed Baldiga was representing him, and met with Baldiga prior to the meeting with Beal to discuss strategy. At that point, BRF & G had not been retained in this matter. As the meeting began, a Beal representative asked Baldiga whom he was representing. Carabetta, Pouladdej, and Baldiga stepped out of the room and decided that Baldiga would represent Pouladdej. They returned and informed Beal of their decision. During the meeting, Pouladdej offered to purchase Beal's mortgages, but the parties were unable to reach an agreement.

After the meeting, Joseph Carabetta asked Baldiga to represent WELP in further negotiations with Beal. Baldiga agreed and, on August 14, 1997, they signed an engagement letter. Baldiga billed WELP for the time he spent on the meeting (3.2 hours including preparation time, totaling $1,008). Pouladdej was not billed for Baldiga's July 29, 1997 services.

WELP ceased making debt service payments to Beal in August, 1997. On August 9, 1997, Pouladdej executed a secured demand note lending WELP $25,000. Baldiga prepared the note on behalf of WELP. Then, on March 2, 1998, a day before WELP filed for bankruptcy protection, Pouladdej sold the note to the Tron Group for $2,500. Pouladdej discussed the note and its effect on this proceeding with Baldiga. Baldiga told Pouladdej that "Water's Edge would not favor the plan sponsor being a lender to the debtor." At WELP's request, Baldiga prepared the instrument that transferred the note. Pouladdej testified that he sold it because he was unwilling to risk the note in bankruptcy proceedings.

Late in 1997, WELP again made efforts in pursuit of a voluntary transfer of the property to Pouladdej. On December 19, 1997, BRF & G sent a letter to WELP enclosing a draft of a deal that would restructure Beal's mortgage and transfer control of the property to Pouladdej. Throughout the intra-familial negotiations relating to this proposal, Baldiga represented WELP. However, Pouladdej (who became engaged to Evelyn in November) was not represented by separate counsel. Beal claims that BRF & G sent Pouladdej a term sheet outlining a proposal to purchase Beal's mortgage and that Beal rejected this second proposal, but the record is unclear on this point. Baldiga also did other work in procuring an environmental approval for Pouladdej's company, First Tower Funding, L.L.C., in November or December, 1997.

In February 1998, Baldiga sent a letter, on WELP's behalf, offering to pay Beal $300,000 to avoid a receivership hearing. The money was to be paid by Pouladdej. Beal did not accept that offer. Some time that March, Pouladdej retained his own counsel, Robert Seder, Esq. However, Seder did not file his appearance with the bankruptcy court until May 5, 1998.

WELP filed for bankruptcy protection on March 3, 1998. Pouladdej and Evelyn Carabetta were married on March 6, 1998. The petition was accompanied by a request for authorization to employ BRF & G. The retention application noted that WELP had already paid BRF & G a $510,000 nonrefundable retainer. It also included Baldiga's required disclosure statement, which stated that Baldiga represented Pouladdej in previous unrelated matters, such as the

acquisition of building six. The statement also briefly discussed the July, 1997 work-out meeting, stating that BRF & G represented *both* WELP and Pouladdej. At the request of the U.S. Trustee and without Beal's knowledge, Baldiga supplemented that disclosure on April 6, 1998 with additional details of the meeting. In both statements, he stated emphatically that BRF & G had not represented Pouladdej since that meeting. In a letter to the U.S. Trustee's Office, he stated: "Again, at that meeting, before that meeting, and since [Pouladdej] has held no interest adverse to the Debtor and the Debtor and [Pouladdej] have no claims against each other of any type." (Letter from Baldiga to Downing of 4/6/98, at 5.) He added:

> We understand that in the industry Beal is known as a "bottom fisherman," or vulture investor that buys pools of defaulted loans (or "bundles" in the trade). Beal has been an extremely aggressive adversary and seems to be committed to defeating any reorganization at any cost. Accordingly, I would ask you to please keep this communication strictly confidential within your office.

(*Id.*)

The court approved WELP's application to retain BRF & G on April 2, 1998 (the "Retention Order"). The following day, Beal, apparently not having realized the court issued the order, filed an objection to BRF & G's representation. The court took no action on the untimely objection. A week later, Beal filed a motion for reconsideration, which the court denied. On April 30, 1998, Beal moved to disqualify BRF & G. The court held a non-evidentiary hearing on June 1, 1998, and then denied the motion.

On July 15, 1998, BRF & G filed its final fee application seeking an order authoriz-ing WELP to pay $588,715.00 in legal fees and $46,732.04 in expenses. Beal objected arguing that: (1) BRF & G added no value to the debtor's estate; (2) the fees and expenses were excessive; (3) the court should have reviewed fees for pre-petition work; and (4) the court should have disqualified BRF & G as an interested party. On September 2, 1998, the court held a non-evidentiary hearing, and on September 4, 1998, allowed payment with the exception of $978.75 for meals and $2,775.00 for secretarial overtime.

### 2. *Disqualification Appeal*[21]

 Beal contends that the court should have allowed the motion to disqualify because BRF & G's extensive relationships with WELP insiders created a conflict of interest. "The Bankruptcy Code imposes particularly rigorous conflict-of-interest restraints upon the employment of professional persons in a bankruptcy case." *See Rome v. Braunstein,* 19 F.3d 54, 57–59 (1st Cir.1994) (concerning undisclosed conflicts of interest in a chapter 11 by debtor's counsel which resulted in disallowance of fees); *In re Martin,* 817 F.2d 175, 180 (1st Cir.1987). An attorney authorized to represent a debtor in a bankruptcy proceeding has a duty to represent the best interests of the debtor *and* its creditors. *Rome,* 19 F.3d at 57.

The Bankruptcy Code allows debtors to employ only those attorneys who meet strict conflict standards. It states:

> Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys ... that do not hold or represent an interest adverse to the estate, and that are disinterested persons to repre-

21. Beal argues that the court erred by ruling on the motion without holding an evidentiary hearing. However, Beal never explicitly requested an evidentiary hearing, and its failure to do so relieved the bankruptcy court of any obligation to hold one. *See Prebor v. Collins (In re I Don't Trust),* 143 F.3d 1, 3–4 (1st Cir.1998) (finding a non-evidentiary hearing appropriate where the appellant "never specifically requested that the bankruptcy court hold an evidentiary hearing"); *cf.* 11 U.S.C. § 102(1)(B)(i) (authorizing the court to act without a hearing if one is not requested by a party).

sent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a). The court "may deny allowance of compensation ... if, at any time during such ... employment ..., such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate ..." 11 U.S.C. § 328(c).

Section 327 establishes a two-part test which must be satisfied if a lawyer is to be authorized to act as counsel for a debtor. First, the lawyer must be "disinterested." *See Smith v. Marshall (In re Hot Tin Roof, Inc.)*, 205 B.R. 1000, 1002 (1st Cir. BAP 1997). An attorney is disinterested as long as he "is not a creditor, an equity security holder, or an insider" and "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor ... or for any other reason." 11 U.S.C. § 101(14)(A), (E).

The purpose of the disinterest requirement of 11 U.S.C. § 327 is to "prevent *even the appearance of a conflict* irrespective of the integrity of the person or firm under consideration ... which might be reflected in [the attorney's] decision[s] concerning estate matters." *In re Martin*, 817 F.2d at 181 (citation omitted, emphasis added). Accordingly, an inquiry does not have to ask "whether a conflict exists—although an actual conflict of any degree of seriousness will obviously present a towering obstacle—but *whether a potential conflict, or the perception of one* renders the lawyer's interest materially adverse to the estate or the creditors." *Id.* at 182 (emphasis added). These disinterestedness requirements must be strictly enforced. *See In re Hot Tin Roof*, 205 B.R. at 1003.

Second, the lawyer cannot "hold or represent an interest adverse to the bankrupt estate." *Id.* at 1002.

[A]n 'adverse interest' has been described in pragmatic terms as (1) the 'possess[ion] or the assert[ion][of] mutually exclusive claims to the same economic interest, thus creating either an actual or potential dispute between rival claimants as to which ... of them the disputed right or title to the interest in question attaches under valid and applicable law; or (2) [the possession of] a predisposition or interest under circumstances that render such a bias in favor of or against one of the entities.

*Rome*, 19 F.3d at 58 n. 1 (alterations in original) (quoting *In re Roberts*, 46 B.R. 815, 826–27 (Bankr.D.Utah 1985)). Together with the disinterested requirement, this provision "serves the important policy of ensuring that all professionals appointed pursuant to section 327(a) tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities." *Id.* at 58. The test is not subjective but it contemplates "an objective screening for even the 'appearance of impropriety.'" *Id.* There can be a disqualifying conflict even absent proof of actual loss or injury. *Id.* at 61.

After a non-evidentiary hearing, Judge Queenan denied Beal's motion to disqualify BRF & G for the following reasons:

I'm denying the motion, and I'm denying it really for two reasons, one procedurally. We have visited this issue twice before. This is, in essence, the third time, and the firm of Brown/Rudnick, its affiliations we have looked at before. This case was set down for hearing because we had never had a hearing on the matter. I think perhaps that was one motivation, but—and I wanted to be sure that people had a chance at least to express their views, but nothing—nothing new has occurred here that is significant on the question of Brown/Rudnick's qualifications.

On the merits of the case—on the merits of the question, the merits clearly, in my mind, do not warrant disqualifying Brown, Rudnick. The chief complaint

seems to be Mr. Pouladdej. Brown, Rudnick's representation of Mr. Pouladdej was brief, pre-petition. It was done at the request of the debtor, and it is over. There has been no representation of Mr. Pouladdej by Brown, Rudnick during this proceeding. That's clear. Mr. Seder is a well-known bankruptcy practitioner with a well-known firm here, and Mr. Pouladdej has more than adequate representation.

(Appellant Exh. Fee Application 1:067.)

 Whether counsel has a conflict of interest is case-specific inquiry that requires intensive fact finding. *See In re Martin,* 817 F.2d 175, 182 (1st Cir.1987). Therefore, appellate courts must give appropriate deference to the bankruptcy court's "front-line" position by reviewing factual findings for clear error. *See Rome,* 19 F.3d at 58. Legal interpretations, however, are reviewed de novo. *See id.*

 With respect to the substantive grounds, the court's findings do not directly address the *appearance* of conflict as required by the First Circuit. *See In re Martin,* 817 F.2d at 182 ("Perceptions are important; how the matter likely appears to creditors and to other parties in legitimate interest should be taken into account.").

Beal raised three sources of alleged conflict. The first alleged source of conflict stems from BRF & G's non-refundable retainer. Most bankruptcy retainers are security retainers which provide that unused funds must be returned to the bankruptcy estate at the end of the representation. *See In re Bread & Chocolate, Inc.,* 148 B.R. 81, 83 (Bankr.D.D.C.1992); *In re McDonald Bros. Const., Inc.,* 114 B.R. 989, 1002 (Bankr.N.D.Ill.1990). Beal claims that WELP designated the retainer non-refundable so that creditors would not be able to collect unused funds at the end of the proceedings. Although WELP's initial disclosure statement designated the retainer non-refundable, BRF & G later stated that it would treat the retainer as a security retainer and return any excess funds to the debtor's estate at the conclusion of the matter. Also, the fact that actual fees ($631,693.29) exceeded the retainer ($510,-000) moots the issue.

The second potential conflict relates to BRF & G's extensive involvement with the Carabetta family in unrelated matters. Over the past four years, BRF & G has represented WELP, Evelyn Carabetta, Consolidated Properties, Inc. (partly owned by Ralph Carabetta), Pouladdej, and CMC.[22] The firm has also had discussions with Joseph Carabetta and his son Salvatore about possible engagements in the future. These representations span a wide range of subject areas, including prenuptial agreements, estate planning, and property acquisitions.

The continuing representation of insiders, particularly Pouladdej, triggers the concern highlighted by *Rome* that inside information possessed by counsel concerning the nature and value of the debtor's assets was "information that [counsel] could have used (or been tempted to use) to enable his other client ... to submit a better calibrated bid than arm's-length bidders could venture, thereby potentially chilling bidding at the expense of [the debtor] and its creditors." *Rome,* 19 F.3d at 61–62.

The final alleged source of conflict relates to BRF & G's representation of Pouladdej in this matter. In July, 1997, Baldiga represented Pouladdej at a loan workout meeting with Beal where Pouladdej attempted to purchase Beal's loans. Also, although not formally representing

---

22. Most of these engagements were completed before WELP retained the firm in this matter. However, BRF & G did provide minimal services to Evelyn Carabetta ($2,447 for services in connection with a pre-nuptial agreement and an unrelated real estate trans-action), CPI (unrelated fee litigation totaling $1,596), and Pouladdej (less than 1 hour of unbilled time retrieving files relating to his acquisition of building six) after being retained by Beal.

him at the time, BRF & G worked closely with Pouladdej on several other pre-petition issues. Specifically, BRF & G: 1) counseled Pouladdej that he could not sponsor the plan while holding a $25,000 demand note against the partnership; 2) drafted the instrument that transferred that note to the Tron Group; 3) drafted a proposal that would transfer control of the property to Pouladdej; and 4) sent a letter to Beal stating that Pouladdej would pay Beal $300,000 if Beal did not attempt to put WELP into receivership. Also significant is the fact that Pouladdej was not represented by separate counsel during WELP's internal pre-petition negotiations. Once WELP filed for bankruptcy protection, Pouladdej retained Robert Seder, Esq. However, Seder did not formally enter his appearance before the bankruptcy court until two months later.

BRF & G's extensive involvement with Pouladdej in *this matter*, as well as other significant matters (like the purchase of building six the previous year), raises a basis for concern about the firm's loyalties. In light of the prior representation of the plan sponsor in his unsuccessful efforts to gain control of the buildings at a meeting with Beal, one can hardly fault Beal for being queasy: Would WELP have negotiated a better deal with Pouladdej if WELP had been represented by another firm? A reasonable creditor might believe that BRF & G would place Pouladdej's interests above the creditors' interests. Any additional funds from the equity purchase could have been used to pay more of WELP's unsecured debt than the meager .1% the plan offers. The concerns about the appearance of conflict are particularly salient in this case because it involves a private sale of the equity in a single asset real estate limited partnership from a father-in-law to a son-in-law who had been represented by the same law firm on this and other real estate matters. The bankruptcy court's findings do not give me solace that it considered adequately the perception of a conflict.

Therefore, I remand the case to the bankruptcy court, which has first-hand knowledge of this case and is extremely experienced in chapter eleven reorganizations, to assess whether there was an actual conflict of interest or a potential conflict of interest which renders the lawyer's interest materially adverse to the estate or the creditors with findings of fact and conclusions of law.

I have a procedural question as well. The court's findings indicate that the judge considered procedural grounds as a separate basis for denying the motion. But, because the judge addressed the merits, it is not clear whether he felt those grounds by themselves were sufficient to support the court's action. Indeed, one court has held that the failure of an attorney to be a "disinterested person" is not a matter that can be waived. *U.S. Trustee v. S.S. Retail Stores, Corp. (In re S.S. Retail Stores Corp.)*, 211 B.R. 699, 703 (9th Cir. BAP 1997). WELP presses procedural deficiency on appeal. Beal argues it was not untimely because the plan naming Pouladdej as Plan Sponsor was not filed until March 23, 1998—after the retention order. Beal also points out that it received the supplemental declaration of Baldiga, which did provide new information, only hours prior to the retention hearing.

Because the appearance of a conflict of interest and the timeliness of the objection is best addressed by the bankruptcy court, I remand this issue to the bankruptcy court for further findings. The bankruptcy court should explain (1) whether there are independent procedural grounds to support the decision to deny disqualification; (2) whether BRF & G should have been disqualified based on the appearance of conflict or an actual conflict; and (3) whether any sanctions (i.e. fee disallowance in whole or in part) are appropriate after hearing. *See* 11 U.S.C. § 328(c) (allowing the court to deny compensation for fees and expenses if a professional person holds an interest adverse to the estate or is not disinterested); *In re Martin*, 817

F.2d at 182–83 (stating that possible remedies for an adverse interest include, but are not limited to, "disallowance of all or some fees"). This decision will be reviewed under an abuse of discretion standard. *See In re Marvel Entertainment Group, Inc.*, 140 F.3d at 476.

### 3. *Fee Application*

Beal also challenges the merits of the court's authorization for WELP to pay BRF & G's fees and expenses from the bankruptcy estate. WELP originally moved for authorization to pay BRF & G $635,447.04 for legal fees and expenses. After a non-evidentiary hearing, the court authorized payment with the exception of $3,754.75 for secretarial overtime and meals. WELP moved to dismiss this appeal arguing that Beal failed to file a timely notice of appeal.

WELP argues that Beal lost the right to appeal the fee authorization order because the hard copy of Beal's notice of appeal was not filed until the morning after the notice period ran. The bankruptcy court authorized WELP to pay BRF & G's fee on September 2, 1998. The order was entered into the record on September 4, 1998. To appeal that order, Beal must have filed a notice of appeal with the bankruptcy court within ten days of the date the order was entered. *See* Fed. R.Bankr.P. 8002. On the last day of that period, September 14, 1998, Beal filed a notice of appeal by facsimile. The following morning it delivered a hard copy of its notice to the court. Because the hard copy was filed after the notice period, Beal's appeal is time barred unless the Court accepts its facsimile filing.

The Federal Rules of Civil Procedure authorize courts to adopt local rules to allow electronic filing provided that method of doing so is consistent with the Federal Judicial Conferences's technical standards. *See* Fed.R.Civ.P. 5(e). The Conference has authorized courts to accept facsimile filings in compelling circumstances. *See* Reports of Proceedings of the Judicial Conference of the U.S. 52–53 (1991); *see also* 1st Cir.R. 25 (adopting such a rule). This district has not yet adopted a rule permitting electronic filing. Moreover, the bankruptcy court's local rules specifically prohibit the filing of documents that require a filing fee, such as notices of appeal, by facsimile. *See* Bankr. D.Mass.R. 5005–4.

Beal argues that this Court should exercise its inherent discretion to accept Beal's faxed notice. In the cover letter accompanying the Beal's notice of appeal, Beal's counsel, who are located in Dallas, Texas, stated that they did not receive the bankruptcy court's order until September 14. That day they faxed the required notice, and then sent a hard copy immediately thereafter. The hard copy was filed at 9:39 a.m. on September 15. Under the circumstances, Beal argues it made every reasonable effort to comply with the filing requirements.

Although the equities are on Beal's side, the law is not because the local rules do not permit facsimile filings. *See McIntosh v. Antonino*, 71 F.3d 29, 34 (1st Cir.1995) ("Absent a local rule authorizing the practice, facsimile filings in federal court are dead on arrival."). The delayed notice of the court's order is irrelevant to the timeliness of this appeal. *See* Fed.R.Bankr.R. 9022(a) ("Lack of notice on the entry does not affect time to appeal or relieve or authorize the court to relieve a party for failure to appeal within the time allowed, except as permitted in Rule 8002."). However, pursuant to Fed.R.Bank.P. 8002(c)(2), the Bankruptcy Court may grant a request to extend the time for filing a notice of appeal made within 20 days after the expiration of the appeal period upon a showing of "excusable neglect." Nothing in the record indicates that Beal made such a request. Accordingly, the appeal is dismissed.

## IV. *ORDER*

With respect to the confirmation appeal (CA 98–40185–PBS) and the rents appeal

(CA 98–40099–PBS), the Court *AFFIRMS* the bankruptcy court's rulings with the exception of it's valuation of Beal's secured claim. On that issue, the Court *REVERSES* the bankruptcy court and *REMANDS* the case to bankruptcy court to reassess the plan's feasibility in light of the claim's new value. With respect to the disqualification appeal (CA 98–40160–PBS), the Court *REMANDS* the case to the bankruptcy court. The fee appeal (CA 98–40211–PBS) is *DISMISSED.*